**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,

                  Plaintiffs,

    -v-

C.O.R. INJURY CENTERS, INC d/b/a COR
MEDICAL CENTERS OF KENDALL,
ZERIOSHA ZAPATA, GAMALIEL G. MATTOS,
M.D., ANKEET AMRISH CHOXI, M.D., COR
INJURY CENTERS OF EAST MIAMI INC,
ANDREW MARTIN HALL, M.D., ORLANDO
INJURY CENTER, INC d/b/a C.O.R. INJURY
CENTERS OF ORLANDO, ADAM M. EL
KOMMOS, M.D., RICHARD P. BOWSER, M.D.,
C.O.R. INJURY CENTERS OF NORTH MIAMI
INC, C.O.R. INJURY CENTERS OF HIALEAH
INC, ERICK MARCELO SALADO, M.D.,
STEVEN J. RIZZOLO, M.D., COR INJURY
CENTERS OF JACKSONVILLE INC, JOSEPH B.
SLUHOSKI, M.D., COR INJURY CENTERS OF
WEST BROWARD INC, C.O.R. INJURY
CENTERS OF HOLLYWOOD INC, C.O.R.
INJURY CENTERS OF HOMESTEAD INC.,
LUIS E. GRAU, M.D., COR MEDICAL
CENTERS OF KISSIMMEE INC, COR
MEDICAL CENTERS OF POMPANO INC., COR
MEDICAL CENTERS OF TAMPA INC, COR
MEDICAL CENTERS OF WEST PALM BEACH
INC, COR MEDICAL CENTERS OF LAKE
WORTH INC., TELEEMC LLC d/b/a FIRST
VISIT MD, JEFFREY APPLEBAUM, and
MITCHELL ERIK KURZNER, M.D.,

                  Defendants.

_____/

**Jury Trial Demand**

## **COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs") hereby allege as follows:

1.     This action seeks to recover more than $26,000,000.00 that the Defendants wrongfully obtained from GEICO by submitting, or causing to be submitted:

    (i)     thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through C.O.R. Injury Centers, Inc d/b/a COR Medical Centers of Kendall ("COR Kendall"), COR Injury Centers of East Miami Inc ("COR East Miami"), Orlando Injury Center Inc d/b/a C.O.R. Injury Centers of Orlando ("COR Orlando"), C.O.R. Injury Centers of North Miami Inc ("COR North Miami"), C.O.R. Injury Centers of Hialeah Inc ("COR Hialeah"), COR Injury Centers of Jacksonville Inc ("COR Jacksonville"), COR Injury Centers of West Broward Inc ("COR West Broward"), C.O.R. Injury Centers of Hollywood Inc ("COR Hollywood"), C.O.R. Injury Centers of Homestead Inc. ("COR Homestead"), COR Medical Centers of Kissimmee Inc ("COR Kissimmee"), COR Medical Centers of Pompano Inc. ("COR Pompano"), COR Medical Centers of Tampa Inc ("COR Tampa"), COR Medical Centers of West Palm Beach Inc ("COR West Palm"), and COR Medical Centers of Lake Worth Inc. ("COR Lake Worth")(collectively the "COR Clinics") for purported chiropractic services, physical therapy services, patient examinations, extracorporeal shockwave therapy ("ESWT"), interventional pain management services, and epidurograms; and

    (ii)    thousands of fraudulent and unlawful PIP insurance charges through TeleEMC LLC d/b/a First Visit MD ("TeleEMC") for purported patient examinations, "self care training", and "therapeutic activities"; and

2.     The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO PIP insurance policies ("Insureds").

3.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful no-fault PIP claims that the Defendants have submitted – or caused to be submitted – through the COR Clinics and

TeleEMC.

4.      As set forth fully herein, the Defendants never were entitled to PIP insurance reimbursement in connection with the billing they submitted to GEICO, because:

(i)      at all relevant times, the Defendants operated in violation of Florida law, including the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817. 234(7) (the "False and Fraudulent Insurance Claims Statute"), Florida's Patient Brokering Act, Fla. Stat § 817.505 (the "Patient Brokering Act"), Florida's Anti-Kickback Statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute"), and Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering their PIP insurance charges noncompensable and unenforceable;

(ii)     in many cases, COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed and unsupervised individuals;

(iii)    in many cases, the billing submitted through COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law");

(iv)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO; and

(vi)    in many cases, the Fraudulent Services never were provided in the first instance.

5.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the COR Clinics and TeleEMC.

6.      The Defendants at all relevant times have known that they were not entitled to

receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

7.     The charts annexed hereto as Exhibits "1" - "15" set forth large, representative samples of the fraudulent claims that have been identified to date that the Defendants have submitted to GEICO.

8.     The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $26,000,000.00.

## I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.     Defendants

10.     Defendant COR Kendall is a Florida corporation with its principal place of business in Miami, Florida. COR Kendall was incorporated in Florida on or about November 18, 2015, was owned and controlled by Zeriosha Zapata ("Zapata"), and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Zapata resides in and is a citizen of Florida, and is not licensed to practice any health care profession in Florida. Zapata owned and controlled the COR Clinics, and used the COR Clinics as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     Defendant Gamaliel G. Mattos, M.D. ("Mattos") resides in and is a citizen of

4

Florida. Mattos currently is approximately 79 years-old, and – although he graduated from medical school in Cuba in or around 1970 – he did not obtain a license to practice medicine in Florida until November 19, 2004, and he is not board-certified in any medical specialty. Mattos falsely purported to serve as the medical director at: (i) COR Kendall between January 2016 and June 2024; (ii) COR East Miami between June 2024 and November 2025; (iii) COR North Miami between December 2016 and June 2024; (iv) COR Hialeah between December 2016 and June 2024; (v) COR West Broward between June 2017 and January 2021; and (vi) COR Homestead between May 2017 and June 2024.

13.     Mattos has a history of professional discipline by the Florida Department of Health (the "Department of Health"). In particular, in December 2024, Mattos was fined and ordered to complete continuing education courses based upon his failure to ensure that a Miami surgery center, where he was the designated physician, was operated in compliance with Florida law.

14.     Upon information and belief, Mattos's relatively advanced age, lack of board-certification, and history of professional discipline – which can be located by prospective employers, referral sources, and patients through an internet search – has made it difficult for him to obtain legitimate employment as a physician, and contributed to his motive to participate in the fraudulent and unlawful scheme described herein.

15.     Defendant Ankeet Amrish Choxi, M.D. ("Choxi") resides in and is a citizen of Florida. Choxi was licensed to practice medicine in Florida on September 11, 2018. Choxi falsely purported to serve as the medical director at: (i) COR Kendall between June 2024 and the present; (ii) COR North Miami between June 2024 and the present; (iii) COR East Miami between November 2025 and the present; (iv) COR Orlando between May 2022 and February 2023; (v) COR West Broward between February 2021 and the present; (vi) COR Kissimmee between May

2022 and February 2023; (vii) COR Pompano between October 2021 and the present; and (viii) COR West Palm between February 2021 and June 2024, and purported to perform many of the Fraudulent Services that were billed through the COR Clinics to GEICO.

16.     Defendant COR East Miami is a Florida corporation with its principal place of business in Miami, Florida. COR East Miami was incorporated on or about February 7, 2019, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17.     Defendant Andrew Martin Hall, M.D. ("Hall") resides in and is a citizen of New York. Hall was licensed to practice medicine in Florida on August 27, 2019. Hall falsely purported to serve as the medical director at: (i) COR East Miami between October 2019 and June 2024; (ii) COR Jacksonville between October 2019 and June 2024; and (ii) COR Hollywood between November 2018 and June 2024.

18.     Defendant COR Orlando is a Florida corporation with its principal place of business in Orlando, Florida. COR Orlando was incorporated in Florida on or about April 7, 2016, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

19.     Defendant Adam M. El Kommos, M.D. ("El Kommos") resides in and is a citizen of Florida. El Kommos was licensed to practice medicine in Florida on April 2, 2019. El Kommos falsely purported to serve as the medical director at: (i) COR Orlando between June 2020 and April 2022, and again between February 2023 and March 2024; and (ii) COR Kissimmee between June 2021 and April 2022, and again between February 2023 and January 2024.

20.     Defendant Richard P. Bowser, M.D. ("Bowser") resides in and is a citizen of Florida. Bowser was licensed to practice medicine in Florida on May 22, 2019. Bowser falsely

purported to serve as the medical director at: (i) COR Jacksonville between April 2025 to the present; (ii) COR Orlando between March 2024 and the present; (iii) COR Kissimmee between January 2024 and the present; and (iv) COR Tampa between April 2023 and the present.

21.     Defendant COR North Miami is a Florida corporation with its principal place of business in Miami Gardens, Florida. COR North Miami was incorporated in Florida on or about May 18, 2016, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

22.     Defendant COR Hialeah is a Florida corporation with its principal place of business in Hialeah, Florida. COR Hialeah was incorporated in Florida on or about October 4, 2016, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

23.     Defendant Erick Marcelo Salado, M.D. ("Salado") resides in and is a citizen of Florida. Salado was licensed to practice medicine in Florida on April 20, 1989. Salado falsely purported to serve as the medical director at: (i) COR Hialeah between June 2024 and the present; and (ii) COR Homestead between February 2025 and the present.

24.     Defendant Steven J. Rizzolo ("Rizzolo") resides in and is a citizen of Florida. Rizzolo was licensed to practice medicine in Florida on December 20, 2019. Rizzolo falsely purported to serve as the medical director at COR Jacksonville between October 2024 and April 2025.

25.     Rizzolo has a history of professional discipline by the Florida Board of Medicine. In particular, in March 2025, Mattos was fined due to an incident in September 2021 where Rizzolo performed a wrong-site procedure on a patient.

26.     Upon information and belief, Rizzolo's history of professional discipline – which

can be located by prospective employers, referral sources, and patients through an internet search – has made it difficult for him to obtain legitimate employment as a physician, and contributed to his motive to participate in the fraudulent and unlawful scheme described herein.

27.     Defendant COR Jacksonville is a Florida corporation with its principal place of business in Jacksonville, Florida. COR Jacksonville was incorporated in Florida as "1 Florida Health Inc" on or about July 6, 2016, amended its name to "C.O.R. Interventional Medicine Inc" on or about October 30, 2017, and amended its name to "COR Medical Centers of Jacksonville Inc" on or about September 6, 2024. COR Jacksonville was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

28.     Defendant Joseph B. Sluhoski, M.D. ("Sluhoski") resides in and is a citizen of Florida. Sluhoski was licensed to practice medicine in Florida on May 30, 2019. Sluhoski falsely purported to serve as the medical director at: (i) COR Jacksonville between June 2024 and October 2024; (ii) COR Hollywood between June 2024 and the present; (iii) COR West Palm between June 2024 to the present; and (iv) COR Lake Worth between October 2024 to the present.

29.     Defendant COR West Broward is a Florida corporation with its principal place of business in Sunrise, Florida. COR West Broward was incorporated in Florida on or about March 8, 2017, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

30.     Defendant COR Hollywood is a Florida corporation with its principal place of business in Hollywood, Florida. COR Hollywood was incorporated in Florida on or about April 3, 2017, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

8

31.     Defendant COR Homestead is a Florida corporation with its principal place of business in Homestead, Florida. COR Homestead was incorporated in Florida on or about April 3, 2017, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

32.     Defendant Luis E. Grau, M.D. ("Grau") resides in and is a citizen of Florida. Grau was licensed to practice medicine in Florida on June 19, 2004. Grau falsely purported to serve as the medical director at COR Homestead between June 2024 and January 2025.

33.     Defendant COR Kissimmee is a Florida corporation with its principal place of business in Kissimmee, Florida. COR Kissimmee was incorporated in Florida on or about May 4, 2021, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

34.     Defendant COR Pompano is a Florida corporation with its principal place of business in Pompano Beach, Florida. COR Pompano was incorporated in Florida on or about September 29, 2021, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

35.     Defendant COR Tampa is a Florida corporation with its principal place of business in Tampa, Florida. COR Tampa was incorporated in Florida on or about February 1, 2023, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

36.     Defendant COR West Palm Beach is a Florida corporation with its principal place of business in West Palm Beach, Florida. COR West Palm Beach was incorporated in Florida on or about December 4, 2023, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

37. Defendant COR Lake Worth is a Florida corporation with its principal place of business in Greenacres, Florida. COR Lake Worth was incorporated in Florida on or about September 16, 2024, was owned and controlled by Zapata, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

38. TeleEMC is a Florida limited liability company with its principal place of business in Boca Raton, Florida. TeleEMC was organized on or about March 27, 2019, had: (i) Charles Ged ("C. Ged") and Marius Ged ("M. Ged") as its members and managers between March 2019 and November 2021; (ii) C. Ged, M. Ged, and Jeffrey Applebaum ("Applebaum") as its members and managers between January 2021 and November 2021; and (iii) Applebaum as its member and manager between November 2021 and the present, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

39. Defendant Applebaum resides in and is a citizen of Florida. Applebaum owned and controlled TeleEMC between January 2021 and the present, and used TeleEMC as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

40. Defendant Mitchell Erik Kurzner, M.D. ("Kurzner") resides in and is a citizen of Florida. Kurzner was licensed to practice medicine in Florida on July 1, 1984. Kurzner falsely purported to serve as the medical director TeleEMC between March 2022 and the present, and purported to perform Fraudulent Services on behalf of TeleEMC.

## III.    Other Relevant Individuals at the COR Clinics

41. Although not presently named as Defendants in this action, William Michael Seufert, D.C. ("Seufert"), Angeny Contreras Lugo, D.C. ("Lugo"), Michael Donald Jefferson, D.C. ("Jefferson"), Adriana Maria Azamar, A.P.R.N. ("Azamar"), Orville Dwain Cameron, D.C. ("Cameron"), Lloyd Howard Gomberg, D.C. ("Gomberg"), Ernesto Delgado, A.P.R.N.

("Delgado"), Felipe Ruiz Contro, D.C. ("Contro"), Andrew Bernard Cave, D.C. ("Cave"), Uche Ukeagu, D.C. ("Ukeagu"), Carly Stephanie Lutz, D.C. ("Lutz"), Binyamin Avraham Sussman, D.C. ("Sussman"), Gustavo Hubert Marshall, D.C. ("Marshall"), Robert Lopinto, D.C. ("Lopinto"), Thomas Christian Gyorfi, D.C. ("Gyorfi"), Crystal Sale, D.C. ("Sale"), Angela Renee Walker Gillis, D.C. ("Gillis"), Cleberton Sousa Bastos, D.C. ("Bastos"), Andrew W George, D.C. ("George"), Rafael Antonio Codinach, D.C. ("Codinach"), Steven Lorin Long, D.C. ("Long"), Phuc T Armstrong, D.C. ("Armstrong"), Sherif Musa, D.C. ("Musa"), Kevin Marc Lopez, D.C. ("Lopez"), John Martin Crocco, P.A. ("Crocco"), and Roberto Javier Aliaga, D.C. ("Aliaga") are relevant to understanding Plaintiffs' claims in this action.

42.    Seufert, Lugo, Jefferson, Azamar, Cameron, Gomberg, Delgado, Contro, Cave, Ukeagu, Lutz, Sussman, Marshall, Lopinto, Gyorfi, Sale, Gillis, Bastos, George, Codinach, Long, Armstrong, Musa, Lopez, and Aliaga are, respectively, chiropractors and a physician assistant who were employed by or associated with the COR Clinics, and who purported to perform Fraudulent Services on behalf of the COR Clinics at the direction of the COR Clinics, Zapata, Mattos, Choxi, Hall, El Kommos, Salado, Grau, Rizzolo, Sluhoski, and Bowser.

## IV.    **Other Relevant Individuals at TeleEMC**

43.    Although not presently named as Defendants in this action, Carolina Chi-Hein Sobel, A.P.R.N. ("Sobel"), Zuzette Marie Heathcote, P.A. ("Heathcote"), Rudy Anthony Lacosse, P.A. ("Lacosse"), Julio Ramos ("Ramos"), Antonio Abreu Jr., A.P.R.N. ("Abreu"), and Steven Adam Burack, D.O. ("Burack") are relevant to understanding Plaintiffs' claims in this action.

44.    Sobel, Heathcote, Lacrosse, Ramos, Abreu, and Burack are, respectively, advanced practice registered nurses, physician assistants, and a physician who were employed by or associated with TeleEMC, and who purported to perform Fraudulent Services on behalf of

TeleEMC at the direction of Applebaum and Kurzner.

45.     In addition, Burack falsely purported to serve as TeleEMC's "medical director" between March 2020 and March 2022.

46.     In September 2025, Burack's license to practice medicine was suspended after Burack pleaded guilty to one count of attempt and conspiracy to commit mail fraud in the United States District Court in the Southern District of Florida, in connection with a Medicare fraud scheme.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

48.     The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

49.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

50.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.     Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

51.     Florida has a comprehensive statutory system designed to ensure that motor vehicle

12

accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to Insureds.

52.     Under the No-Fault Law, an Insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

53.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

54.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

55.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

56.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

57.     Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint

a physician as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

58.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

59.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

60.     Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

61.     What is more, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

62.     Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

63.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state

14

laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

64.     Therefore, in order for a health care practice to qualify for this "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to legitimately supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws.

65.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

66.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

67.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients.

68.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

69.     Florida's Patient Brokering Act broadly prohibits any person from offering, paying, soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly,

in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

70.     Likewise, Florida's Anti-Kickback Statute prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients. Violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

71.     Insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act or Anti-Kickback Statute, whether or not the underlying health care services were medically necessary or actually provided.

72.     PIP reimbursement for health care services is limited to $2,500.00 per injured person, unless a physician, physician assistant, or advanced practice registered nurse determines that the injured person suffered from an "emergency medical condition", in which case health care providers can be reimbursed up to $10,000.00 per injured person for health care services.

73.     Pursuant to the No-Fault Law, an "emergency medical condition" means a "medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) serious jeopardy to patient health. (b) serious impairment to bodily functions. (c) serious dysfunction of any bodily organ or part."

74.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

75.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     in accordance with generally accepted standards of medical practice;

(b)     clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     not primarily for the convenience of the patient, physician, or other health care provider.

76.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

77.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

78.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

79.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

80.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

17

(ii)     for any service or treatment that is "unbundled", meaning that it is properly billed under a single billing code, but is billed using two or more billing codes so as to result in payment in an amount greater than would be paid using the proper, single billing code;

(iii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iv)     with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

81.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

82.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

83.     To "directly supervise" a service, a health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

84.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the practitioner who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or

Supplier, Including Degrees or Credentials."

85.     Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Interrelated Fraudulent Schemes

86.     Since at least 2020, and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent and unlawful schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

## A.     The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead, and the Misrepresentations Regarding the Identities of the Actual Treating Practitioners

87.     The Defendants' fraudulent and unlawful schemes included the submission of billing through the COR Clinics for purported "physical therapy" services.

88.     As set forth in Exhibits "1" – "14", the purported "physical therapy" services constituted the majority of the Fraudulent Services that were billed through the COR Clinics to GEICO.

89.     In the claims for "physical therapy" services identified in Exhibits "1" – "2", "4" – "5", and "7" – "9", the services unlawfully were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including individuals named Surania De La Paz, L.M.T. ("De La Paz"), Daniel Quesada Fiffe, L.M.T. ("Fiffe"), Lazaro Estrada, L.M.T. ("Estrada"), Amel Gomez Noguel, L.M.T. ("Noguel"), Isaac Aguilar, L.M.T. ("Aguilar"), Neyda Castellanos, L.M.T. ("Castellanos"), Janet Sevilla, L.M.T.

("Sevilla"), Olga Bartumeu, L.M.T. ("Bartumeu"), Neyda Castellanos, L.M.T. ("Castellanos"), Yusmila Negrin, L.M.T. ("Negrin"), Jorge Ruiz Tartabull, L.M.T. ("Tartabull"), Merlin Mora Perez, L.M.T. ("Perez"), Humberto Arrabal Cruz, L.M.T. ("Cruz"), Yadira Aballe, L.M.T. ("Aballe"), Pedro Jose Pena Garnier, L.M.T. ("Garnier"), Ivan Martin, L.M.T. ("Martin"), Sarah Acosta, L.M.T. ("Acosta"), Mariam Landera, L.M.T. ("Landera"), Fatima Diaz, L.M.T. ("Diaz"), Jose L Segura Gamez, L.M.T. ("Gamez"), and Edith Fernandez, L.M.T. ("E. Fernandez").

90.     Aguilar, Castellanos, Sevilla, Bartumeu, Castellanos, Negrin, and Noguel were employed or associated with COR Kendall, and purported to perform many of the Fraudulent Services on behalf of COR Kendall.

91.     Fiffe and Estrada were employed by or associated with COR East Miami, and purported to perform many of the Fraudulent Services on behalf of COR East Miami.

92.     Aballe, Garnier, and Martin were employed by or associated with COR North Miami, and purported to perform many of the Fraudulent Services on behalf of COR North Miami.

93.     De La Paz and Diaz were employed by or associated with COR Hialeah, and purported to perform many of the Fraudulent Services on behalf of COR Hialeah.

94.     Acosta and Landera were employed by or associated with COR West Broward, and purported to perform many of the Fraudulent Services on behalf of COR West Broward.

95.     Gamez and E. Fernandez were employed by or associated with COR Hollywood, and purported to perform many of the Fraudulent Services on behalf of COR Hollywood.

96.     Tartabull, Perez, and Cruz were employed by or associated with COR Homestead, and purported to perform many of the Fraudulent Services on behalf of COR Homestead.

97.     COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, Hall, Sluhoski, Grau, and

Salado were aware of the fact that they could not legally recover PIP Benefits for services performed by massage therapists or unsupervised/unlicensed individuals.

98.     As a result, and in order to conceal the fact that Aguilar, Castellanos, Sevilla, Bartumeu, Castellanos, Negrin, Noguel, Fiffe, Estrada, Aballe, Garnier, Martin, De La Paz, Diaz, Acosta, Landera, Gamez, E. Fernandez, Tartabull, Perez, Cruz, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed to GEICO through COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead, COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, Hall, Salado, Sluhoski, and Grau deliberately omitted any reference to Aguilar, Castellanos, Sevilla, Bartumeu, Castellanos, Negrin, Noguel, Fiffe, Estrada, Aballe, Garnier, Martin, De La Paz, Diaz, Acosta, Landera, Gamez, E. Fernandez, Tartabull, Perez, Cruz, and other massage therapists and unlicensed/unsupervised individuals associated with COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead on the HCFA-1500 forms that they used to bill for putative physical therapy services.

99.     Instead, in the claims for physical therapy services identified in Exhibits "1" – "2", "4" – "5", and "7" – "9", COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, and Hall routinely and falsely listed Seufert and Cave in Box 31 of the HCFA-1500 forms as the supposed providers or direct supervisors of the physical therapy services.

100.     In fact, Seufert and Cave – who were simultaneously purporting to work at numerous health care practices at numerous locations – did not legitimately perform or directly

supervise the physical therapy services in the claims identified in in Exhibits "1" – "2", "4" – "5", and "7" – "9", and could not have legitimately performed or directly supervised the physical therapy services.

101.    For example:

(i)     On April 13, 2020, COR North Miami, Zapata, Mattos, and Cave purported to provide at least 66 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 16.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise: (a) at least one ten-minute initial examination, one 30-minute initial examination, and one ten-minute follow-up examination on three GEICO Insureds at COR North Miami; and (b) at least 27 additional physical therapy services purportedly provided to at least four additional GEICO Insureds at COR Kendall, including at least 6.75 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on April 13, 2020.

(ii)    On May 15, 2020, COR Homestead, Zapata, Mattos, and Cave purported to provide at least 19 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise: (a) at least one ten-minute follow-up examination on one GEICO Insured at COR Homestead; and (b) at least 76 additional physical therapy services purportedly provided to at least ten individual GEICO Insureds at COR Kendall, including at least 19 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23.75 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on May 15, 2020.

(iii)   On June 22, 2020, COR North Miami, Zapata, Mattos, and Cave purported to provide at least 50 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 12.5 hours of physical therapy

services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise: (a) at least one 20-minute initial examination and one five-minute follow-up examination on two GEICO Insureds at COR North Miami; and (b) at least 40 additional physical therapy services purportedly provided to at least six individual GEICO Insureds at COR Kendall, including at least 10 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on June 22, 2020.

(iv)    On April 29, 2021, COR West Broward, Zapata, Choxi, and Cave purported to provide at least 28 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least seven hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise at least 56 additional physical therapy services purportedly provided to at least eight individual GEICO Insureds at COR Kendall, including at least 14 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on April 29, 2021.

(v)     On May 3, 2021, COR Hialeah, Zapata, Mattos, and Seufert purported to provide at least 42 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 10.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise: (a) at least three 30-minute initial examinations, one 20-minute follow-up examination, and one 30-minute follow-up examination on five additional GEICO Insureds at COR Kendall; and (b) at least 110 additional physical therapy services purportedly provided to at least 17 additional GEICO Insureds at COR Kendall, including at least 27.5 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on May 3, 2021.

(vi)    On May 24, 2021, COR Kendall, Zapata, Mattos, and Seufert purported to provide at least 133 individual physical therapy services to at least 19 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is

more, those putative treatments included at least 33.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise: (a) at least one 30-minute initial examination and three five-minute follow-up examinations on three GEICO Insureds at COR Kendall; and (b) at least 43 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at COR Hialeah, including at least 10.75 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 44.75 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on May 24, 2021.

(vii)   On August 19, 2021, COR Hollywood, Zapata, Hall, and Cave purported to provide at least 47 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 11.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise at least 60 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at COR West Broward, including at least 15 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.75 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on August 19, 2021.

(viii)  On January 21, 2022, COR Hialeah, Zapata, Mattos, and Seufert purported to provide at least 92 individual physical therapy services to at least 12 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 23 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise, at least 120 additional physical therapy services purportedly provided to at least 19 additional GEICO Insureds at COR Kendall, including at least 30 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 53 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on January 21, 2022.

(ix)    On January 24, 2022, COR Kendall, Zapata, Mattos, and Seufert purported to provide at least 104 individual physical therapy services to at least 19 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 33.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating

provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise, at least 118 additional physical therapy services purportedly provided to at least 15 additional GEICO Insureds at COR Hialeah, including at least 29.5 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 55.5 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on January 24, 2022.

(x)     On January 25, 2022, COR Hialeah, Zapata, Mattos, and Cave purported to provide at least 129 individual physical therapy services to at least 17 individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 32.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise, at least: (a) at least two 30-minute initial examinations on two GEICO Insureds at COR Hialeah and at least one 15-minute initial examination and one 10-minute follow-up examination on two additional GEICO Insureds at COR West Broward; and (b) at least 18 additional physical therapy services purportedly provided to four additional GEICO Insureds at COR West Broward, including at least 4.5 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 38 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on January 25, 2022.

(xi)    On January 26, 2022, COR West Broward, Zapata, Choxi, and Cave purported to provide at least 25 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Cave personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 6.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Cave also purported to perform, or at least directly supervise, at least 70 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at COR Hialeah, including at least 17.5 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23.75 hours of services that Cave purported to perform, or at least directly supervise, at multiple locations on January 26, 2022.

(xii)   On February 2, 2022, COR East Miami, Zapata, Hall, and Seufert purported to provide at least 58 individual physical therapy services to at least 11 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 14.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating

provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise: (a) at least three 30-minute initial examinations on three GEICO Insureds at COR East Miami; and (b) at least 117 additional physical therapy services purportedly provided to at least 19 additional GEICO Insureds at COR Kendall, including at least 29.25 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 45 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on February 2, 2022.

(xiii)   On August 31, 2022, COR Hollywood, Zapata, Hall, and Seufert purported to provide at least 88 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 22 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise: (a) at least one 20-minute follow-up examination on one GEICO Insured at COR Hollywood; and (b) at least 58 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at COR Pompano, including at least 7.25 hours of direct, one-to-on patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on August 31, 2022.

(xiv)   On September 14, 2022, COR Hollywood Zapata, Hall, and Seufert purported to provide at least 60 individual physical therapy services to at least 12 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 15 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise at least 47 additional physical therapy services purportedly provided to at least five additional GEICO Insureds at COR Pompano, including at least 11.75 hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.75 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on September 14, 2022.

(xv)   On September 12, 2024, COR West Broward, Zapata, Choxi, and Seufert purported to provide at least 73 individual physical therapy services to at least 13 individual Insureds, and falsely contended in the resulting bills to GEICO that Seufert personally performed, or at least directly supervised, each one of those treatments. What is more, those putative treatments included at least 18.25 hours of physical

therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Seufert also purported to perform, or at least directly supervise at least 8 additional physical therapy services purportedly provided to at least 2 additional GEICO Insureds at COR Pompano, including at least two hours of direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.25 hours of services that Seufert purported to perform, or at least directly supervise, at multiple locations on September 12, 2024.

102.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "2", "4" – "5", and "7" – "9", COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, and Hall routinely falsely represented that Seufert and Cave had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services they simultaneously were purporting to perform or directly supervise at other health care clinics at multiple locations on those same dates.

103.    It is impossible that Seufert and Cave routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

104.    Furthermore, upon information and belief, the fraudulent billing for physical therapy services that COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, and Hall submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

105.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

106.    It is improbable, to the point of impossibility, that COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead,

Zapata, Mattos, Choxi, and Hall only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers within the Florida market.

107.    Thus, upon information and belief, the impossible number of physical therapy services that Seufert and Cave purported to directly supervise or provide to GEICO Insureds at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead on individual dates of service, including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Seufert and Cave purported to perform or directly supervise on those same dates of service.

108.    In the claims for "physical therapy" services identified in Exhibits "1" – "2", "4" – "5", and "7" – "9", COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, Hall, Salado, Sluhoski, and Grau routinely falsely represented that the physical therapy services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unsupervised/unlicensed individuals, and because the clinics operated in violation of Florida law; and

(iii)   COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, and Hall systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

109.    In this context, Zapata, Mattos, Choxi, Hall, Salado, Sluhoski, and Grau – who, at

all relevant times, purported to be the medical directors at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead, respectively – did not, and could not have, legitimately served as medical directors of each of the clinics.

110.    Had Zapata, Mattos, Choxi, Hall, Salado, Sluhoski, and Grau legitimately served as the medical directors of the COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead, respectively, they would have noted – among other things – that the physical therapy services provided at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead were unlawfully performed by massage therapists and unsupervised/unlicensed individuals, and unlawfully billed to GEICO.

**B.      The Defendants' Fraudulent Treatment and Billing Protocols**

111.    In the claims identified in Exhibits "1" – "15", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

112.    Even so, in the claims identified in Exhibits "1" – "15", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to Insureds.

113.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" – "15" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any significant

continuing medical problems arising from any automobile accidents.

114.   Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

115.   No legitimate physician, health care practitioner, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

116.   The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.     The Fraudulent Charges for Initial Examinations at COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano**

117.   As an initial step in their fraudulent treatment and billing protocols, COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau purported to provide many of the Insureds in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" with initial examinations.

118.   The purported initial examinations then were billed to GEICO in the following manner:

     (i)      in the claims identified in Exhibit "1", COR Kendall, Zapata, Mattos, and Choxi billed GEICO under CPT codes 99203 or 99204 for each initial examination that they purported to provide;

     (ii)     in the claims identified in Exhibit "2", COR East Miami, Zapata, Hall, Mattos, and Choxi typically billed GEICO under CPT code 99203 for each initial examination that they purported to provide;

(iii)    in the claims identified in Exhibit "3", COR Orlando, Zapata, El Kommos, Choxi, and Bowser typically billed GEICO under CPT codes 99203 and 99204 for each initial examination that they purported to provide;

(iv)    in the claims identified in Exhibit "5", COR Hialeah, Zapata, Mattos, and Salado typically billed GEICO under CPT code 99203 for each initial examination that they purported to provide;

(v)    in the claims identified in Exhibit "6", COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Salado typically billed GEICO under CPT codes 99203 and 99204 for each initial examination that they purported to provide;

(vi)    in the claims identified in Exhibit "7", COR West Broward, Zapata, Mattos, and Choxi typically billed GEICO under CPT codes 99203 and 99204 for each initial examination that they purported to provide;

(vii)    in the claims identified in Exhibit "8", COR Hollywood, Zapata, Hall, and Sluhoski typically billed GEICO under CPT code 99203 for each initial examination that they purported to provide;

(viii)    in the claims identified in Exhibit "9", COR Homestead, Zapata, Mattos, Grau, and Salado typically billed GEICO under CPT code 99203 for each initial examination that they purported to provide; and

(ix)    in the claims identified in Exhibit "11", COR Pompano, Zapata, and Choxi typically billed GEICO under CPT code 99203 for each initial examination that they purported to provide.

119.    In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau falsely represented that they were entitled to recover PIP Benefits in the first instance, when in fact they were not because they operated in violation of Florida law, as set forth herein.

120.    In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi,

El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau also misrepresented the nature, extent, and results of the initial examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

121.    Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99203 to bill for an initial examination typically requires that the Insured present with problems of moderate severity.

122.    The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

123.    Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

124.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically requires that the Insured present with problems of moderate to high severity.

125.     The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

   (i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

   (ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

   (iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

   (iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

   (v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

   (vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

   (vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

126.     Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

127.     However, to the extent that the Insureds in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" had any presenting problems at all as the result of the typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

128.     For instance, in many of the claims identified in Exhibits "1" – "3", "5" – "9", and "11", the Insureds did not seek treatment at any hospital as the result of their accident, and to the

limited extent that the Insureds in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

129.    Furthermore, in most of the claims identified in Exhibits "1" – "3", "5" – "9", and "11", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

130.    Even so, in the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau billed for the putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity. In fact, the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems as the result of any automobile accidents at all at the time of the purported examinations.

131.    For example:

(i)    On May 29, 2020, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JE's vehicle was drivable following the accident. The police report further indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JE by Lopinto on July 8, 2020, COR Kendall, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On December 11, 2020, an Insured named OP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that OP's vehicle was drivable following the accident. The police report further indicated that OP was not injured and did not complain of any pain at the scene. In keeping with the fact that OP was not seriously injured, OP did not visit any hospital emergency room following the accident. To the extent that OP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of OP by Codinach on December 16, 2020, COR East Miami, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On December 25, 2020, an Insured named AB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AB's vehicle was drivable following the accident. The police report further indicated that AB was not injured and did not complain of any pain at the scene. In keeping with the fact that AB was not seriously injured, AB did not visit any hospital emergency room following the accident. To the extent that AB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AB by Lopinto on December 28, 2020, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On February 28, 2021, an Insured named VT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that VT's vehicle was drivable following the accident. The police report further indicated that VT was not injured and did not complain of any pain at the scene. In keeping with the fact that VT was not seriously injured, VT did not visit any hospital emergency room following the accident. To the extent that VT experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of VT by Gomberg on March 3, 2021, COR East Miami, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)    On March 27, 2021, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AA by Choxi on May 6, 2021, COR Orlando, Zapata, and El Kommos billed GEICO for

the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On March 31, 2021, an Insured named CI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CI's vehicle was drivable following the accident. The police report further indicated that CI was not injured and did not complain of any pain at the scene. In keeping with the fact that CI was not seriously injured, CI did not visit any hospital emergency room following the accident. To the extent that CI experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CI by Contro on April 22, 2021, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)    On July 27, 2021, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of HC by Crocco on September 2, 2021, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)   On September 15, 2021, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SK by Seufert on September 16, 2021, COR Kendall, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)     On February 18, 2022, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured and did not complain of any pain at the scene. In keeping with the fact that AG was not seriously injured, AG did not visit any hospital emergency room following the accident. To the extent that

AG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AG by Choxi on March 25, 2022, COR Jacksonville, Zapata, and Hall billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)     On April 1, 2022, an Insured named IZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that IZ's vehicle was drivable following the accident. The police report further indicated that IZ was not injured and did not complain of any pain at the scene. In keeping with the fact that IZ was not seriously injured, IZ did not visit any hospital emergency room following the accident. To the extent that IZ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of IZ by Stefan Alexander Prada, M.D. ("Prada") on May 17, 2022, COR Orlando, Zapata, and El Kommos billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)    On May 5, 2022, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JR by Seufert on May 23, 2022, COR Kendall, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii)   On June 1, 2022, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of TS by Christina Adriana Moreno, D.C. ("Moreno") on June 3, 2022, COR Pompano, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)  On June 6, 2022, an Insured named OF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact

collision and that OF's vehicle was drivable following the accident. The police report further indicated that OF was not injured and did not complain of any pain at the scene. In keeping with the fact that OF was not seriously injured, OF did not visit any hospital emergency room following the accident. To the extent that OF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of OF by Sussman on June 8, 2022, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiv)   On June 7, 2022, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JL by Contro on June 20, 2022, COR Hialeah, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xv)   On August 10, 2022, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of HC by Seufert on August 12, 2022, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xvi)   On September 25, 2022, an Insured named KR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KR's vehicle was drivable following the accident. The police report further indicated that KR was not injured and did not complain of any pain at the scene. In keeping with the fact that KR was not seriously injured, KR did not visit any hospital emergency room following the accident. To the extent that KR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of KR by Contro on December 2, 2022, COR Hialeah, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xvii)   On December 30, 2022, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AR by Lopinto on January 3, 2023, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xviii)  On February 16, 2023, an Insured named YK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that YK's vehicle was drivable following the accident. The police report further indicated that YK was not injured and did not complain of any pain at the scene. In keeping with the fact that YK was not seriously injured, YK did not visit any hospital emergency room following the accident. To the extent that YK experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of YK by Contro on February 17, 2023, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xix)    On April 7, 2023, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured and did not complain of any pain at the scene. In keeping with the fact that JW was not seriously injured, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JW by Choxi on July 28, 2023, COR Jacksonville, Zapata, and Hall billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)     On April 18, 2023, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JA by Gillis on May 3, 2023, COR Orlando, Zapata, and El Kommos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the

initial examination involved presenting problems of moderate severity.

(xxi)   On July 27, 2023, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of DC by Andrew Joshua Appel, M.D. ("Appel") on August 17, 2024, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxii)  On August 31, 2023, an Insured named EB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that EB's vehicle was drivable following the accident. The police report further indicated that EB was not injured and did not complain of any pain at the scene. In keeping with the fact that EB was not seriously injured, EB did not visit any hospital emergency room following the accident. To the extent that EB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of EB by Lopinto September 14, 2023, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxiii) On November 15, 2023, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not seriously injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SP by Dianna Lynn Finley, D.C. ("Finley") on November 29, 2023, COR Pompano, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxiv)  On April 3, 2024, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS

experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MS by Marshall on April 9, 2024, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxv) On April 18, 2024, an Insured named RN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RN's vehicle was drivable following the accident. The police report further indicated that RN was not injured and did not complain of any pain at the scene. In keeping with the fact that RN was not seriously injured, RN did not visit any hospital emergency room following the accident. To the extent that RN experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of RN by Grau on May 3, 2024, COR Jacksonville, Zapata, and Hall billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxvi) On May 17, 2024, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and did not complain of any pain at the scene. In keeping with the fact that AD was not seriously injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AD by Seufert on May 29, 2024, COR Pompano, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxvii) On November 29, 2024, an Insured named CK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CK's vehicle was drivable following the accident. The police report further indicated that CK was not injured and did not complain of any pain at the scene. In keeping with the fact that CK was not seriously injured, CK did not visit any hospital emergency room following the accident. To the extent that CK experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CK by Maria Margarita Salado, P.A. ("M. Salado") on December 10, 2024, COR Kendall, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxviii) On January 29, 2025, an Insured named CW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CW's vehicle was drivable following the accident. The

police report further indicated that CW was not injured and did not complain of any pain at the scene. In keeping with the fact that CW was not seriously injured, CW did not visit any hospital emergency room following the accident. To the extent that CW experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CW by M. Salado on February 4, 2025, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxix)   On February 11, 2025, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. In keeping with the fact that GV was not seriously injured, GV did not visit any hospital emergency room following the accident. To the extent that GV experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of GV by Contro on February 12, 2025, COR Hialeah, Zapata, and Salado billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxx)   On April 8, 2025, an Insured named SS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SS's vehicle was drivable following the accident. The police report further indicated that SS was not injured and did not complain of any pain at the scene. In keeping with the fact that SS was not seriously injured, SS did not visit any hospital emergency room following the accident. To the extent that SS experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SS by Codinach on April 28, 2025, COR East Miami, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

132.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely falsely represented that the Insureds presented with problems of moderate severity and moderate to high severity in order to: (i) create a false basis for their charges

for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Amount of Time Spent on the Purported Initial Examinations**

133.    What is more, in the claims identified in Exhibits "1" – "3", "5" – "9", and "11", the charges for the initial examinations under CPT codes 99203 and 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent providing the examinations.

134.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the health care practitioner who performed the underlying examination spent at least 30 minutes performing the examination.

135.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the health care practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

136.    As set forth in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau typically billed the purported initial-up examinations to GEICO through COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano under CPT codes 99203 and 99204, and thereby represented that the health care practitioners who purported to conduct the examinations spent at least 30-45 minutes performing the examinations.

137.    In fact, in the initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", the health care practitioners who purported to perform the initial examinations on behalf of COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano – typically Choxi, Azamar, Varela-Rico, Seufert, Codinach, Sale, Gillis, Bastos, Contro, Delgado, Grau, Appel, Ukeagu, Finley, Lutz, and Lopinto – never spent more than 15-20 minutes when conducting the examinations, much less 30-45 minutes.

138.    For instance, and in keeping with the fact that the initial examinations allegedly provided through COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano did not take more than 15-20 minutes of time to perform, the examining practitioners used templates in purporting to conduct the initial examinations.

139.    All that was required to complete the templates was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

140.    These brief interviews and examinations did not require Choxi, Azamar, Varela-Rico, Seufert, Codinach, Sale, Gillis, Bastos, Contro, Delgado, Grau, Appel, Ukeagu, Finley, Lutz, Lopinto, or any other examining health care practitioner associated with COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano to spend more than 15-20 minutes performing the putative initial examinations.

141.    Moreover, the purported initial examinations in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" were not legitimately performed at all, inasmuch as the outcomes of the examinations were pre-determined to result in false soft tissue injury diagnoses and

medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining practitioners to spend more than 15-20 minutes performing the initial examinations.

142.     In the claims for initial examinations that are identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

### (iii)   Misrepresentations Regarding the Extent of the Medical Decision-Making During the Purported Initial Examinations

143.     Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

144.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

145.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the health care practitioner who performed the examination engaged

in legitimate "low complexity" medical decision-making in connection with the examination.

146.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things: (i) involve review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) there typically must be at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

147.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

148.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

149.    In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", when COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau billed GEICO for putative initial examinations under CPT codes 99203 and 99204, they falsely represented that the practitioners

who purported to perform the examinations on behalf of COR Kendall, COR East Miami, COR

Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR

Homestead, and COR Pompano engaged in some legitimate low or moderate complexity medical

decision-making in connection with the examinations.

150.    In actuality, the purported initial examinations did not involve any legitimate

medical decision-making at all.

151.    Rather, in the claims for initial examinations identified in Exhibits "1" – "3", "5" –

"9", and "11": (i) the initial examinations did not involve the retrieval, review, or analysis of any

significant amount of medical records, diagnostic tests, or other information; (ii) there was no risk

of significant complications or morbidity – much less mortality – from the Insureds' minor soft-

tissue injury complaints, to the extent that they ever had any complaints arising from automobile

accidents at all; and (iii) COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR

Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata,

Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, Grau, and their associates

did not consider any significant number of diagnoses or treatment options for Insureds during the

initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or

similar soft tissue injury "diagnoses" for almost every Insured, regardless of their true individual

circumstances or presentation.

152.    For example:

(i)     On September 15, 2020, an Insured named GV was involved in an automobile
        accident. The contemporaneous police report indicated that the accident was a low-
        impact collision and that GV's vehicle was drivable following the accident. The
        police report further indicated that GV was not injured and did not complain of any
        pain at the scene. In keeping with the fact that GV was not seriously injured, GV
        did not visit any hospital emergency room following the accident. To the extent that
        GV experienced any health problems at all as a result of the accident, they were of
        low or minimal severity. Even so, on September 28, 2020, Choxi purported to

conduct an initial examination of GV at COR Kendall. To the extent that Choxi performed the examination in the first instance, Choxi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Choxi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Choxi provided GV with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GV's presenting problems, nor the treatment plan provided to GV by COR Kendall, Zapata, Mattos, and Choxi presented any risk of significant complications, morbidity, or mortality. To the contrary, GV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Kendall, Zapata, Mattos, and Choxi consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GV. Even so, COR Kendall, Zapata, Mattos, and Choxi billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Choxi engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On October 13, 2020, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To the extent that GC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on October 15, 2020, Ukeagu purported to conduct an initial examination of GC at COR West Broward. To the extent that Ukeagu performed the examination in the first instance, Ukeagu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ukeagu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ukeagu provided GC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither GC's presenting problems, nor the treatment plan provided to GC by COR West Broward, Zapata, Mattos, and Ukeagu presented any risk of significant complications, morbidity, or mortality. To the contrary, GC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR West Broward, Zapata, Mattos, and Ukeagu consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to GC. Even so, COR West Broward, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ukeagu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)     On March 9, 2021, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact

collision and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not seriously injured, RR did not visit any hospital emergency room following the accident. To the extent that RR experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 9, 2021, Lopinto purported to conduct an initial examination of RR at COR Homestead. To the extent that Lopinto performed the examination in the first instance, Lopinto did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopinto did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopinto provided RR with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither RR's presenting problems, nor the treatment plan provided to RR by COR Homestead, Zapata, Mattos, and Lopinto presented any risk of significant complications, morbidity, or mortality. To the contrary, RR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Homestead, Zapata, Mattos, and Lopinto consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RR. Even so, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopinto engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On March 27, 2021, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 6, 2021, Choxi purported to conduct an initial examination of AA at COR Orlando. To the extent that Choxi performed the examination in the first instance, Choxi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Choxi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Choxi provided AA with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by COR Orlando, Zapata, El Kommos, and Choxi presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Orlando, Zapata, El Kommos, and Choxi consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AA. Even so, COR Orlando, Zapata, El Kommos, and Choxi billed GEICO for the

initial examination using CPT code 99204, and thereby falsely represented that Choxi engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)    On August 26, 2021, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that NV's vehicle was drivable following the accident. The police report further indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not seriously injured, NV did not visit any hospital emergency room following the accident. To the extent that NV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on August 26, 2021, Codinach purported to conduct an initial examination of NV at COR East Miami. To the extent that Codinach performed the examination in the first instance, Codinach did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Codinach did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Codinach provided NV with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither NV's presenting problems, nor the treatment plan provided to NV by COR East Miami, Zapata, Hall, and Codinach presented any risk of significant complications, morbidity, or mortality. To the contrary, NV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR East Miami, Zapata, Hall, and Codinach consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to NV. Even so, COR East Miami, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Codinach engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On November 19, 2021, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 24, 2021, Contro purported to conduct an initial examination of RG at COR Hollywood. To the extent that Contro performed the examination in the first instance, Contro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Contro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Contro provided RG with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither RG's presenting problems, nor the treatment plan

provided to RG by COR Hollywood, Zapata, Hall, and Contro presented any risk of significant complications, morbidity, or mortality. To the contrary, RG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Hollywood, Zapata, Hall, and Contro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RG. Even so, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Contro engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)  On February 6, 2022, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DO's vehicle was drivable following the accident. The police report further indicated that DO was not injured and did not complain of any pain at the scene. In keeping with the fact that DO was not seriously injured, DO did not visit any hospital emergency room following the accident. To the extent that DO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 10, 2022, Lopinto purported to conduct an initial examination of DO at COR Homestead. To the extent that Lopinto performed the examination in the first instance, Lopinto did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopinto did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopinto provided DO with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DO's presenting problems, nor the treatment plan provided to DO by COR Homestead, Zapata, Mattos, and Lopinto presented any risk of significant complications, morbidity, or mortality. To the contrary, DO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Homestead, Zapata, Mattos, and Lopinto consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DO. Even so, COR Homestead, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopinto engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)  On May 2, 2022, an Insured named KO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KO's vehicle was drivable following the accident. The police report further indicated that KO was not injured and did not complain of any pain at the scene. In keeping with the fact that KO was not seriously injured, KO did not visit any hospital emergency room following the accident. To the extent that KO experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 5, 2022, Sussman purported to conduct an initial examination of KO at COR West Broward. To the extent that Sussman performed the examination in the first instance, Sussman did not retrieve, review,

or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sussman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sussman provided KO with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither KO's presenting problems, nor the treatment plan provided to KO by COR West Broward, Zapata, Choxi, and Sussman presented any risk of significant complications, morbidity, or mortality. To the contrary, KO did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR West Broward, Zapata, Choxi, and Sussman consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KO. Even so, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Sussman engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On June 12, 2022, an Insured named SC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured and did not complain of any pain at the scene. In keeping with the fact that SC was not seriously injured, SC did not visit any hospital emergency room following the accident. To the extent that SC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 16, 2022, Codinach purported to conduct an initial examination of SC at COR East Miami. To the extent that Codinach performed the examination in the first instance, Codinach did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Codinach did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Codinach provided SC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither SC's presenting problems, nor the treatment plan provided to SC by COR East Miami, Zapata, Hall, and Codinach presented any risk of significant complications, morbidity, or mortality. To the contrary, SC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR East Miami, Zapata, Hall, and Codinach consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SC. Even so, COR East Miami, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Codinach engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)    On June 23, 2022, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured and did not complain of any pain at

the scene. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 30, 2022, Contro purported to conduct an initial examination of JS at COR Hialeah. To the extent that Contro performed the examination in the first instance, Contro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Contro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Contro provided JS with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by COR Hialeah, Zapata, Mattos, and Contro presented any risk of significant complications, morbidity, or mortality. To the contrary, JS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Hialeah, Zapata, Mattos, and Contro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JS. Even so, COR Hialeah, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Contro engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On July 5, 2022, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not seriously injured, AV did not visit any hospital emergency room following the accident. To the extent that AV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on August 26, 2022, Azamar purported to conduct an initial examination of AV at COR Jacksonville. To the extent that Azamar performed the examination in the first instance, Azamar did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Azamar did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Azamar provided AV with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither AV's presenting problems, nor the treatment plan provided to AV by COR Jacksonville, Zapata, Hall, and Azamar presented any risk of significant complications, morbidity, or mortality. To the contrary, AV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Jacksonville, Zapata, Hall, and Azamar consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AV. Even so, COR Jacksonville, Zapata, and Hall billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that Azamar engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)     On December 7, 2022, an Insured named CL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CL's vehicle was drivable following the accident. The police report further indicated that CL was not injured and did not complain of any pain at the scene. In keeping with the fact that CL was not seriously injured, CL did not visit any hospital emergency room following the accident. To the extent that CL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 8, 2022, Gillis purported to conduct an initial examination of CL at COR Orlando. To the extent that Gillis performed the examination in the first instance, Gillis did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gillis did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gillis provided CL with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither CL's presenting problems, nor the treatment plan provided to CL by COR Orlando, Zapata, Choxi, and Gillis presented any risk of significant complications, morbidity, or mortality. To the contrary, CL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Orlando, Zapata, Choxi, and Gillis consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CL. Even so, COR Orlando, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gillis engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)    On December 16, 2022, an Insured named OF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that OF's vehicle was drivable following the accident. The police report further indicated that OF was not injured and did not complain of any pain at the scene. In keeping with the fact that OF was not seriously injured, OF did not visit any hospital emergency room following the accident. To the extent that OF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 19, 2023, Azamar purported to conduct an initial examination of OF at COR Kendall. To the extent that Azamar performed the examination in the first instance, Azamar did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Azamar did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Azamar provided OF with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither OF's presenting problems, nor the treatment plan provided to OF by COR Kendall, Zapata, Mattos, and Azamar presented any

risk of significant complications, morbidity, or mortality. To the contrary, OF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Kendall, Zapata, Mattos, and Azamar consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to OF. Even so, COR Kendall, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Azamar engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)   On December 25, 2022, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured and did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 5, 2023, Contro purported to conduct an initial examination of LG at COR Hialeah. To the extent that Contro performed the examination in the first instance, Contro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Contro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Contro provided LG with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither LG's presenting problems, nor the treatment plan provided to LG by COR Hialeah, Zapata, Mattos, and Contro presented any risk of significant complications, morbidity, or mortality. To the contrary, LG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Hialeah, Zapata, Mattos, and Contro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LG. Even so, COR Hialeah, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Contro engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)   On February 20, 2023, an Insured named DE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DE's vehicle was drivable following the accident. The police report further indicated that DE was not injured and did not complain of any pain at the scene. In keeping with the fact that DE was not seriously injured, DE did not visit any hospital emergency room following the accident. To the extent that DE experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on March 2, 2023, Finley purported to conduct an initial examination of DE at COR Hollywood. To the extent that Finley performed the examination in the first instance, Finley did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other

information in connection with the examination. Moreover, Finley did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Finley provided DE with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither DE's presenting problems, nor the treatment plan provided to DE by COR Hollywood, Zapata, Hall, and Finley presented any risk of significant complications, morbidity, or mortality. To the contrary, DE did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Hollywood, Zapata, Hall, and Finley consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DE. Even so, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Finley engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi) On April 1, 2023, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on April 4, 2023, Codinach purported to conduct an initial examination of MH at COR East Miami. To the extent that Codinach performed the examination in the first instance, Codinach did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Codinach did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Codinach provided MH with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by COR East Miami, Zapata, Hall, and Codinach presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR East Miami, Zapata, Hall, and Codinach consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MH. Even so, COR East Miami, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Codinach engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii) On April 18, 2023, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not seriously injured, JA did not

visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 3, 2023, Gillis purported to conduct an initial examination of JA at COR Orlando. To the extent that Gillis performed the examination in the first instance, Gillis did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gillis did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gillis provided JA with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by COR Orlando, Zapata, El Kommos, and Gillis presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Orlando, Zapata, El Kommos, and Gillis consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JA. Even so, COR Orlando, Zapata, and El Kommos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Gillis engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii) On June 27, 2023, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on August 4, 2023, Lopinto purported to conduct an initial examination of MD at COR Hollywood. To the extent that Lopinto performed the examination in the first instance, Lopinto did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lopinto did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lopinto provided MD with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by COR Hollywood, Zapata, Hall, and Lopinto presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Hollywood, Zapata, Hall, and Lopinto consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MD. Even so, COR Hollywood, Zapata, and Hall billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lopinto engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix)   On November 15, 2023, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not seriously injured, SP did not visit any hospital emergency room following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on November 29, 2023, Finley purported to conduct an initial examination of SP at COR Pompano. To the extent that Finley performed the examination in the first instance, Finley did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Finley did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Finley provided SP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither SP's presenting problems, nor the treatment plan provided to SP by COR Pompano, Zapata, Choxi, and Finley presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Pompano, Zapata, Choxi, and Finley consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SP. Even so, COR Pompano, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Finley engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)   On January 17, 2024, an Insured named DF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that DF's vehicle was drivable following the accident. The police report further indicated that DF was not injured and did not complain of any pain at the scene. In keeping with the fact that DF was not seriously injured, DF did not visit any hospital emergency room following the accident. To the extent that DF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 17, 2024, Contro purported to conduct an initial examination of DF at COR Hialeah. To the extent that Contro performed the examination in the first instance, Contro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Contro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Contro provided DF with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither DF's presenting problems, nor the treatment plan provided to DF by COR Hialeah, Zapata, Mattos, and Contro presented any risk of significant complications, morbidity, or mortality. To the contrary, DF did not need any significant treatment at all as a result of the accident, and the treatment plan

provided by COR Hialeah, Zapata, Mattos, and Contro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DF. Even so, COR Hialeah, Zapata, and Mattos billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Contro engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxi)   On May 17, 2024, an Insured named AD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AD's vehicle was drivable following the accident. The police report further indicated that AD was not injured and did not complain of any pain at the scene. In keeping with the fact that AD was not seriously injured, AD did not visit any hospital emergency room following the accident. To the extent that AD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 29, 2024, Seufert purported to conduct an initial examination of AD at COR Pompano. To the extent that Seufert performed the examination in the first instance, Seufert did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Seufert did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Seufert provided AD with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AD's presenting problems, nor the treatment plan provided to AD by COR Pompano, Zapata, Choxi, and Seufert presented any risk of significant complications, morbidity, or mortality. To the contrary, AD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Pompano, Zapata, Choxi, and Seufert consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AD. Even so, COR Pompano, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Seufert engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxii)  On May 20, 2024, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured and did not complain of any pain at the scene. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 22, 2024, Marshall purported to conduct an initial examination of JV at COR West Broward. To the extent that Marshall performed the examination in the first instance, Marshall did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Marshall did not consider any significant number of diagnoses or management options in connection

with the examination. Instead, Marshall provided JV with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither JV's presenting problems, nor the treatment plan provided to JV by COR West Broward, Zapata, Choxi, and Marshall presented any risk of significant complications, morbidity, or mortality. To the contrary, JV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR West Broward, Zapata, Choxi, and Marshall consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JV. Even so, COR West Broward, Zapata, and Choxi billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Marshall engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiii)  On September 30, 2024, an Insured named MI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MI's vehicle was drivable following the accident. The police report further indicated that MI was not injured and did not complain of any pain at the scene. In keeping with the fact that MI was not seriously injured, MI did not visit any hospital emergency room following the accident. To the extent that MI experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 14, 2025, Varela-Rico purported to conduct an initial examination of MI at COR Jacksonville. To the extent that Varela-Rico performed the examination in the first instance, Varela-Rico did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Varela-Rico did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Varela-Rico provided MI with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither MI's presenting problems, nor the treatment plan provided to MI by COR Jacksonville, Zapata, Sluhoski, and Varela-Rico presented any risk of significant complications, morbidity, or mortality. To the contrary, MI did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Jacksonville, Zapata, Sluhoski, and Varela-Rico consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MI. Even so, COR Jacksonville, Zapata, and Sluhoski billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Varela-Rico engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxiv)  On November 29, 2024, an Insured named CK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CK's vehicle was drivable following the accident. The police report further indicated that CK was not injured and did not complain of any pain at the scene. In keeping with the fact that CK was not seriously injured, CK did not visit any hospital emergency room following the accident. To the extent that

CK experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 10, 2024, Salado purported to conduct an initial examination of CK at COR Kendall. To the extent that Salado performed the examination in the first instance, Salado did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Salado did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Salado provided CK with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither CK's presenting problems, nor the treatment plan provided to CK by COR Kendall, Zapata, Choxi, and Salado presented any risk of significant complications, morbidity, or mortality. To the contrary, CK did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Kendall, Zapata, Choxi, and Salado consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to CK. Even so, COR Kendall, Zapata, Choxi, and Salado billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Salado engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxv)   On February 12, 2025, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on February 14, 2025, Caban-Soto purported to conduct an initial examination of MP at COR Jacksonville. To the extent that Caban-Soto performed the examination in the first instance, Caban-Soto did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Caban-Soto did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Caban-Soto provided MP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by COR Jacksonville, Zapata, Rizzolo, and Caban-Soto presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by COR Jacksonville, Zapata, Rizzolo, and Caban-Soto consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MP. Even so, COR Jacksonville, Zapata, and Rizzolo billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Caban-Soto engaged in some legitimate, low complexity medical decision-making during the purported examination.

153.    These are only representative examples. In the claims identified in Exhibits "1" –
"3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR
Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata,
Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely falsely
represented that the purported examinations involved legitimate low or moderate complexity
medical decision-making, when, in fact, they did not involve any legitimate medical decision-
making at all.

154.    In a legitimate clinical setting, when a patient presents with a soft tissue injury such
as a sprain or strain arising from an automobile accident, the initial standard of care is conservative
treatment comprised of rest, compression, and – if applicable – elevation of the affected body part.

155.    It is generally inappropriate to begin administering physical therapy to a patient
with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried
a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected
body part.

156.    Even so, COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR
Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata,
Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely caused
Insureds to immediately begin a course of physical therapy within days of their accidents because
their putative initial examinations involved no legitimate medical decision-making and had
predetermined outcomes.

157.    There are a substantial number of variables that can affect whether, how, and to
what extent an individual is injured in a given automobile accident.

158.    An individual's age, height, weight, general physical condition, location within the

vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

159.    As set forth herein, in the claims identified in Exhibits "1" – "3", "5" – "9", and "11", the substantial majority of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

160.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

161.    It is likewise improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3", "5" – "9", and "11" would present for an initial examination with substantially similar symptoms, and receive substantially similar diagnoses, on or about the exact same date after their underlying automobile accident.

162.    Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment", despite the fact that they were differently situated.

163.    For example:

(i)     On April 25, 2020, two Insureds – SR and AB – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Jacksonville for initial examinations on the exact same date, May 6, 2020. SR and AB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SR and AB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Jacksonville, Zapata, and Hall caused SR and AB to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii)    On November 24, 2021, three Insureds – NS, MR, and LM – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Homestead for initial examinations on the exact same date, November 29, 2021. NS, MR, and LM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NS, MR, and LM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Homestead, Zapata, and Mattos caused NS, MR, and LM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iii)   On November 25, 2021, three Insureds – DB, AB, and LG – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR East Miami for initial examinations on the exact same date. DB, AB, and LG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DB, AB, and LG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR East Miami, Zapata, and Hall caused DB, AB, and LG to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv)    On April 10, 2022, four Insureds – PP, MP, ID, and JH – were involved in the same automobile accident. Thereafter, all four Insureds presented at COR East Miami for initial examinations on the exact same date, April 20, 2022. PP, MP, ID, and JH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that PP, MP, ID, and JH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR East Miami, Zapata, and Hall caused PP, MP, ID, and JH to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v)     On July 18, 2022, three Insureds – WL, WG, and OG – were involved in the same

automobile accident. Thereafter, all three Insureds presented at COR Hollywood for initial examinations on the exact same date, July 19, 2022. WL, WG, and OG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that WL, WG, and OG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hollywood, Zapata, and Hall caused WL, WG, and OG to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vi)     On September 28, 2022, three Insureds – SG, CP, and AL – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR West Broward for initial examinations on the exact same date, September 28, 2022. SG, CP, and AL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SG, CP, and AL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR West Broward, Zapata, and Choxi caused SG, CP, and AL to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vii)    On October 6, 2022, two Insureds – ST and GM – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Jacksonville for initial examinations on the exact same date, December 19, 2022. ST and GM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ST and GM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Jacksonville, Zapata, and Hall caused ST and GM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(viii)   On November 20, 2022, four Insureds – VC, MT, CV, and LT – were involved in the same automobile accident. Thereafter, all four Insureds presented at COR Kendall for initial examinations on the exact same date. VC, MT, CV, and LT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VC, MT, CV, and LT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Kendall, Zapata, and Mattos caused VC, MT, CV, and LT to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ix)     On November 26, 2022, four Insureds – MH, AH, MG, and NV – were involved in the same automobile accident. Thereafter, all four Insureds presented at COR

Kendall for initial examinations on the exact same date, November 28, 2022. MH, AH, MG, and NV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MH, AH, MG, and NV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Kendall, Zapata, and Mattos caused MH, AH, MG, and NV to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(x)     On February 23, 2023, three Insureds – MC, BC, and CC – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Hollywood for initial examinations on the exact same date, March 7, 2023. MC, BC, and CC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC, BC, and CC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hollywood, Zapata, and Hall caused MC, BC, and CC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xi)    On March 19, 2023, two Insureds – YR and LR – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Hialeah for initial examinations on the exact same date, March 24, 2023. YR and LR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YR and LR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hialeah, Zapata, and Mattos caused YR and LR to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xii)   On April 22, 2023, three Insureds – DS, IS, and HS – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Hialeah for initial examinations on the exact same date, April 25, 2023. DS, IS, and HS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DS, IS, and HS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hialeah, Zapata, and Mattos caused DS, IS, and HS to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiii)  On May 17, 2023, three Insureds – ST, EG, and CT – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Orlando for

initial examinations on the exact same date, June 2, 2023. ST, EG, and CT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ST, EG, and CT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Orlando, Zapata, and Choxi caused ST, EG, and CT to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xiv)   On June 10, 2023, three Insureds – AH, MC, and GH – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR West Broward for initial examinations on the exact same date, June 21, 2023. AH, MC, and GH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AH, MC, and GH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR West Broward, Zapata, and Choxi caused AH, MC, and GH to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xv)   On October 18, 2023, two Insureds – RM and NH – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Pompano for initial examinations on the exact same date, October 19, 2023. RM and NH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RM and NH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Pompano, Zapata, and Choxi caused RM and NH to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xvi)   On November 1, 2023, four Insureds – AR, AR, RR, and AR – were involved in the same automobile accident. Thereafter, all four Insureds presented at COR Hollywood for initial examinations on the exact same date, November 2, 2023. AR, AR, RR, and AR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR, AR, RR, and AR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hollywood, Zapata, and Hall caused AR, AR, RR, and AR to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xvii)   On December 1, 2023, three Insureds – JB, MB, and RB – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Kendall for initial examinations on the exact same date, December 11, 2022. JB, MB, and

RB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JB, MB, and RB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Kendall, Zapata, and Mattos caused JB, MB, and RB to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xviii) On December 23, 2023, four Insureds – DV, ON, YV, and VV – were involved in the same automobile accident. Thereafter, all four Insureds presented at COR West Broward for initial examinations on the exact same date, December 27, 2023. DV, ON, YV, and VV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DV, ON, YV, and VV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR West Broward, Zapata, and Choxi caused DV, ON, YV, and VV to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xix) On April 11, 2024, three Insureds – SB, AP, and KD – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Homestead for initial examinations on the exact same date, April 15, 2024. SB, AP, and KD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SB, AP, and KD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Homestead, Zapata, and Mattos caused SB, AP, and KD to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xx) On May 30, 2024, two Insureds – JG and JM – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Jacksonville for initial examinations on the exact same date, August 1, 2024. JG and JM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JG and JM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Jacksonville, Zapata, Sluhoski, and Hall caused JG and JM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxi) On July 20, 2024, three Insureds – JH, BH, and WA – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Homestead for initial examinations on the exact same date, July 22, 2024. JH, BH, and WA were different ages, in different physical conditions, located in different positions

in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JH, BH, and WA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Homestead, Zapata, and Grau caused JH, BH, and WA to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxii)   On December 22, 2024, three Insureds – JT, NC, and LR – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Orlando for initial examinations on the exact same date, December 23, 2024. JT, NC, and LR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JT, NC, and LR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Orlando, Zapata, and Bowser caused JT, NC, and LR to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxiii)  On January 5, 2025, three Insureds – JA, JB, and WB – were involved in the same automobile accident. Thereafter, all three Insureds presented at COR Orlando for initial examinations on the exact same date, February 6, 2025. JA, JB, and WB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JA, JB, and WB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Orlando, Zapata, and Bowser caused JA, JB, and WB to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxiv)  On March 14, 2025, two Insureds – CT and CT – were involved in the same automobile accident. Thereafter, both Insureds presented at COR Hialeah for initial examinations on the exact same date, March 24, 2025. CT and CT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CT and CT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Hialeah, Zapata, and Salado caused CT and CT to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(xxv)   On April 8, 2025, two Insureds – YC and TJ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at COR Pompano for initial examinations on the exact same date, April 16, 2025. YC and TJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YC and TJ suffered any injuries at all in their accident,

the injuries were different. Even so, at the conclusion of the purported initial examinations, COR Pompano, Zapata, and Choxi caused YC and TJ to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

164.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau frequently caused substantially similar, false "diagnoses" to be issued to more than one Insured involved in a single accident, and caused a substantially similar course of medically unnecessary "treatment" to be recommended to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

165.    In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely falsely represented that the initial examination involved medical decision-making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203 and 99204, because CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

166.    In the claims for initial examinations identified in Exhibits "1" – "3", "5" – "9", and "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely fraudulently represented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they

were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida Law.

**2.    The Fraudulent Charges for Follow-Up Examinations at COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano**

167.    In addition to the fraudulent initial examinations, COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau often purported to subject the Insureds in the claims identified in Exhibits "1" – "3" and "5" – "11", to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

168.    The purported follow-up examinations then were billed to GEICO in the following manner:

(i)     in the claims identified in Exhibit "1", COR Kendall, Zapata, Mattos, and Choxi typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(ii)    in the claims identified in Exhibit "2", COR East Miami, Zapata, Hall, Mattos, and Choxi typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(iii)   in the claims identified in Exhibit "3", COR Orlando, Zapata, El Kommos, Choxi, and Bowser typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(iv)     in the claims identified in Exhibit "5", COR Hialeah, Zapata, Mattos, and Salado typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(v)      in the claims identified in Exhibit "6", COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(vi)     in the claims identified in Exhibit "7", COR West Broward, Zapata, Mattos, and Choxi typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(vii)    in the claims identified in Exhibit "8", COR Hollywood, Zapata, Hall, and Sluhoski typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(viii)   in the claims identified in Exhibit "9", COR Homestead, Zapata, Mattos, Grau, and Salado typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

(ix)     in the claims identified in Exhibit "10", COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser typically billed GEICO under CPT codes 99212 and 99213 for the follow-up examinations that they purported to provide; and

(x)      in the claims identified in Exhibit "11", COR Pompano, Zapata, and Choxi typically billed GEICO under CPT code 99213 for the follow-up examinations that they purported to provide;

169.    As set forth herein, the charges for the follow-up examinations identified in Exhibits "1" – "3" and "5" – "11" misrepresented the nature, extent, and results of the follow-up examinations, and also falsely represented that COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano were operating in accordance with Florida law and were eligible to receive PIP reimbursement in the first place.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems in the Claims for Follow-Up Examinations Under CPT Code 99213**

170.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up

examination typically represents that the patient presented with problems of low to moderate severity at the time of the examination.

171.    The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

(i)     Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increase irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

172.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

173.    However, the extent that the Insureds in the claims identified in Exhibits "1" – "3" and "5" – "11" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

174.    Minor soft tissue injuries such as strains and sprains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" – "3" and "5" – "11" presented for their putative follow-up examinations – typically months or weeks after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

175.    Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "3" and "5" – "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

176.    In the claims for follow-up examinations identified in Exhibits "1" – "3" and "5" – "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau falsely represented that the Insureds presented with problems of low to moderate severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99213, because examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

177.    What is more, in the claims for follow-up examinations identified in CPT codes 99212 and 99213, neither Choxi, Azamar, Varela-Rico, Seufert, Codinach, Sale, Gillis, Bastos, Contro, Delgado, Grau, Appel, Ukeagu, Finley, Lutz, and Lopinto – nor any other physician, chiropractor, or other health care practitioner associated with COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano – took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision making.

178.    Rather, at the direction of Zapata, at COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano, the examining health care practitioners simply: (i) reiterated the false, boilerplate, "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

179.    The putative "follow-up examinations" that COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau purported to provide to the Insureds in the claims identified in Exhibits "1" – "3" and "5" – "11" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-

75

determined for each Insured from the moment they walked into COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano's offices.

180.    In the claims for follow-up examinations identified in Exhibits "1" – "3" and "5" – "11", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely fraudulently represented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)      the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, and COR Pompano never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida law.

**3.      The Fraudulent and Unlawful Charges for Extracorporeal Shockwave Therapy at COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, COR Tampa, COR West Palm, and COR Lake Worth**

181.    COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, COR Tampa, COR West Palm, COR Lake Worth, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau also purported to subject many of the Insureds in the claims identified in Exhibits "1" – "3" and "5" – "14"  to one or more sessions of extracorporeal

shockwave therapy or "ESWT" during the course of their fraudulent treatment protocol, ostensibly to treat the Insureds' supposed back and neck pain.

182.    Typically, the purported ESWT was billed through COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, COR Tampa, COR West Palm, and COR Lake Worth under CPT code 0101T, almost always resulting in a charge of $495.00 for each ESWT treatment that supposedly was provided.

183.    Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT were medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that the Defendants and their associates provided during their fraudulent examinations.

184.    In keeping with the fact that COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, COR Tampa, COR West Palm, COR Lake Worth, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau's ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

185.    Even so, COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR

Pompano, COR Tampa, COR West Palm, COR Lake Worth, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

186.  For example:

(i)  On or about February 15, 2023, COR West Broward, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Broward to an Insured named AD.

(ii)  On or about March 29, 2023, COR Kissimmee, Zapata, and El Kommos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kissimmee to an Insured named DT.

(iii)  On or about May 15, 2023, COR East Miami, Zapata, and Hall billed GEICO for medically unnecessary ESWT that was purportedly provided through COR East Miami to an Insured named WH.

(iv)  On or about July 12, 2023, COR Kendall, Zapata, and Mattos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kendall to an Insured named SS.

(v)  On or about July 26, 2023, COR Homestead, Zapata, and Mattos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Homestead to an Insured named KR.

(vi)  On or about August 17, 2023, COR Hialeah, Zapata, and Mattos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Hialeah to an Insured named MH.

(vii)  On or about August 22, 2023, COR East Miami, Zapata, and Hall billed GEICO for medically unnecessary ESWT that was purportedly provided through COR East Miami to an Insured named BE.

(viii)  On or about September 26, 2023, COR Orlando, Zapata, and El Kommos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Orlando to an Insured named MW.

(ix)  On or about December 8, 2023, COR West Broward, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Broward to an Insured named JE.

(x)  On or about March 7, 2024, COR Tampa, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purported provided through COR Tampa to an Insured named ES.

(xi)  On or about April 17, 2024, COR Kissimmee, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kissimmee to an Insured named AC.

(xii)  On or about June 24, 2024, COR Hialeah, Zapata, and Salado billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Hialeah to an Insured named JR.

(xiii)  On or about July 9, 2024, COR West Broward, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Broward to an Insured named DL.

(xiv)  On or about July 16, 2024, COR West Palm Beach, Zapata, and Sluhoski billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Palm Beach to an Insured named VB.

(xv)  On or about August 12, 2024, COR Kendall, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kendall to an Insured named YT.

(xvi)  On or about September 9, 2024, COR Homestead, Zapata, and Grau billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Homestead to an Insured named DA.

(xvii)  On or about September 19, 2024, COR Kissimmee, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kissimmee to an Insured named JB.

(xviii)  On October 25, 2024, COR Homestead, Zapata, and Grau billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Homestead to an Insured named TB.

(xix)  On or about November 25, 2024, COR Orlando, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Orlando to an Insured named CM.

(xx)  On or about December 6, 2024, COR Jacksonville, Zapata, and Rizzolo billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Jacksonville to an Insured named PS.

(xxi)  On or about December 24, 2024, COR West Broward, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through

COR West Broward to an Insured named MC.

(xxii)  On or about December 31, 2024, COR Jacksonville, Zapata, and Rizzolo billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Jacksonville to an Insured named MR.

(xxiii)  On or about January 7, 2025, COR West Palm Beach, Zapata, and Sluhoski billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Palm Beach to an Insured named TB.

(xxiv)  On or about January 17, 2025, COR Hialeah, Zapata, and Salado billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Hialeah to an Insured named AP.

(xxv)  On or about February 3, 2025, COR Lake Worth, Zapata, and Sluhoski billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Lake Worth to an Insured named PD.

(xxvi)  On or about February 11, 2025, COR Pompano, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Pompano to an Insured named JL.

(xxvii)  On or about February 17, 2025, COR West Palm Beach, Zapata, and Sluhoski billed GEICO for medically unnecessary ESWT that was purportedly provided through COR West Palm Beach to an Insured named MV.

(xxviii) On or about February 24, 2025, COR Tampa, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Tampa to an Insured named LF.

(xxix)  On or about March 3, 2025, COR Jacksonville, Zapata, and Rizzolo billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Jacksonville to an Insured named MG.

(xxx)  On or about March 20, 2025, COR Jacksonville, Zapata, and Rizzolo billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Jacksonville to an Insured named GM.

(xxxi)  On or about March 26, 2025, COR Kendall, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Kendall to an Insured named YD.

(xxxii)  On or about April 10, 2025, COR Pompano, Zapata, and Choxi billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Pompano to an Insured named OZ.

(xxxiii)On or about April 24, 2025, COR Lake Worth, Zapata, and Sluhoski billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Lake Worth to an Insured named DV.

(xxxiv)On or about April 25, 2025, COR East Miami, Zapata, and Mattos billed GEICO for medically unnecessary ESWT that was purportedly provided through COR East Miami to an Insured named CF.

(xxxv) On or about May 6, 2025, COR Orlando, Zapata, and Bowser billed GEICO for medically unnecessary ESWT that was purportedly provided through COR Orlando to an Insured named RM.

187.    These are only representative examples. In the claims for ESWT identified in Exhibits "1" – "3" and "5" – "14", COR Kendall, COR East Miami, COR Orlando, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Kissimmee, COR Pompano, COR Tampa, COR West Palm, COR West Palm, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely billed GEICO for medically unnecessary ESWT.

**4.      The Fraudulent and Unlawful Charges for Physical Therapy at the COR Clinics**

188.    Moreover, the COR Clinics, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau almost always purported to subject each of the Insureds in the claims identified in Exhibits "1" - "14" to months of medically unnecessary physical therapy.

189.    In addition, the COR Clinics, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau caused virtually every Insured to receive substantially similar types of physical therapy services, including: (i) hot/cold packs; (ii); electrical stimulation; (iii) laser therapy; (iv) neuromuscular reeducation; (v) therapeutic exercises; (vi) ultrasound therapy; and (vii) manual therapy.

190.    In the claims for physical therapy services identified in Exhibits "1" – "14", the charges for physical therapy services were fraudulent in that they misrepresented the COR Clinics'

eligibility to collect PIP Benefits in the first instance.

191.    In fact, and as set forth herein, the COR Clinics never were eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

192.    What is more, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to the patient's individual circumstances and presentation.

193.    In keeping with the fact that the purported physical therapy services that were billed through the COR Clinics were not medically necessary, the COR Clinics, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau did not tailor the chiropractic and physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

194.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

195.    However, the COR Clinics, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to almost every Insured in the claims identified in Exhibits "1" – "14", on substantially the same schedule, without regard for the Insureds' individual circumstances.

196.    Specifically, the COR Clinics, Zapata, Hall, Mattos, Choxi, El Kommos, Bowser, Salado, Sluhoski, Rizzolo, and Grau purported to provide the Insureds in the claims identified in Exhibits "1" – "14" with several months of physical therapy services, consisting of hot/cold packs, electrical stimulation, laser therapy, neuromuscular reeducation, therapeutic exercises, ultrasound

therapy, and manual therapy.

197.    This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially similar course of physical therapy treatment.

**5.    The Violations of the Patient Brokering Act and Anti-Kickback Statute at COR Jacksonville, COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano**

198.    The Defendants' interrelated fraudulent schemes depended on the submission of large amounts of PIP billing for medically unwarranted and unlawfully rendered "services".

199.    However, Zapata knew that if he submitted large amounts of fraudulent and unlawful PIP billing through a single entity, using a single tax identification number, it could draw attention to the Defendants' schemes.

200.    Accordingly, Zapata caused the various COR Clinics to be serially incorporated as separate entities, using different tax identification numbers, in order to reduce the volume of billing submitted through any one of the COR Clinics, so as to conceal and perpetuate the Defendants' fraudulent and unlawful schemes.

201.    Then, Zapata caused Insureds to be referred between and among COR Jacksonville, COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano pursuant to unlawful patient brokering arrangements, whereby:

(i)    Zapata, Mattos, Choxi, Sluhoski, and Hall required treating practitioners at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano – in exchange for unlawful compensation, and as a condition of their employment – to refer Insureds to COR Jacksonville for medically unnecessary Fraudulent Services, including but not limited to purported examinations, interventional pain management services, physical therapy, and chiropractic; and

(ii)    Zapata, Sluhoski, and Hall required treating practitioners at COR Jacksonville – in exchange for unlawful compensation, and as a condition of their employment – to

refer Insureds to COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, and COR Pompano to refer Insureds to for medically unnecessary Fraudulent Services, including but not limited to purported physical therapy and chiropractic.

202.    For example, pursuant to these unlawful patient brokering arrangements:

(i)     On or about May 26, 2020, COR East Miami, Zapata, and Hall caused Codinach to refer an Insured named EG from COR East Miami to COR Jacksonville for a medically unnecessary examination, when then was billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Delgado to falsely diagnose the Insured with an "emergency medical condition", and to refer the Insured back to COR East Miami for additional, medically unnecessary chiropractic and physical therapy "treatment".

(ii)    On or about June 18, 2020, COR Homestead, Zapata, and Mattos caused Lopinto to refer an Insured named JE from COR Homestead to COR Jacksonville for a medically unnecessary examination, when then was billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Delgado to falsely diagnose the Insured with an "emergency medical condition", and to refer the Insured back to COR Homestead for additional, medically unnecessary chiropractic and physical therapy "treatment".

(iii)   On or about June 30, 2020, COR Kendall, Zapata, and Mattos caused Cave to refer an Insured named PK from COR Kendall to COR Jacksonville for a medically unnecessary examination, when then was billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Delgado to falsely diagnose the Insured with an "emergency medical condition", and to refer the Insured back to COR Kendall for additional, medically unnecessary chiropractic and physical therapy "treatment".

(iv)    On or about July 8, 2020, COR West Broward, Zapata, and Mattos caused Ukeagu to refer an Insured named DF from COR West Broward to COR Jacksonville for a medically unnecessary examination, when then was billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Delgado to falsely diagnose the Insured with an "emergency medical condition", and to refer the Insured back to COR West Broward for additional, medically unnecessary chiropractic and physical therapy "treatment".

(v)     On or about February 1, 2021, COR East Miami, Zapata, and Hall caused Codinach to refer an Insured named OP from COR East Miami to COR Jacksonville for a medically unnecessary examination, when then was billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Choxi to falsely diagnose the Insured with an "emergency medical condition", and to refer the Insured back to COR East Miami for additional, medically unnecessary chiropractic and physical therapy "treatment".

(vi)     On or about May 9, 2022, COR Pompano, Zapata, and Choxi caused Moreno to refer an Insured named KC from COR Pompano to COR Jacksonville for a medically unnecessary examination and interventional pain management services, when then were billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Choxi to refer the Insured back to COR Pompano for additional, medically unnecessary chiropractic and physical therapy "treatment".

(vii)    On or about August 25, 2022, COR North Miami, Zapata, and Mattos caused Gomberg to refer an Insured named EP from COR North Miami to COR Jacksonville for a medically unnecessary examination and interventional pain management services, when then were billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Crocco to refer the Insured back to COR North Miami for additional, medically unnecessary chiropractic and physical therapy "treatment".

(viii)   On or about April 3, 2023, COR Hollywood, Zapata, and Hall caused Finley to refer an Insured named DE from COR Hollywood to COR Jacksonville for a medically unnecessary examination and interventional pain management services, when then were billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Choxi to refer the Insured back to COR Hollywood for additional, medically unnecessary chiropractic and physical therapy "treatment".

(ix)     On or about November 27, 2023, COR Hialeah, Zapata, and Mattos caused Contro to refer an Insured named EC from COR Hialeah to COR Jacksonville for a medically unnecessary examination and interventional pain management services, when then were billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Choxi to refer the Insured back to COR Hialeah for additional, medically unnecessary chiropractic and physical therapy "treatment".

(x)      On or about May 3, 2024, COR West Broward, Zapata, and Choxi caused Marshall to refer an Insured named RN from COR West Broward to COR Jacksonville for a medically unnecessary examination and interventional pain management services, when then were billed through COR Jacksonville to GEICO. Then, COR Jacksonville, Zapata, and Hall caused Grau to refer the Insured back to COR West Broward for additional, medically unnecessary chiropractic and physical therapy "treatment".

203.    These are only representative examples. In the claims identified in Exhibits "1" –

"2", "4" – "9", and "11", COR Jacksonville, COR Kendall, COR East Miami, COR North Miami,

COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata,

Mattos, Choxi, Sluhoski, and Hall routinely and unlawfully caused patient referrals to be made in exchange for compensation, in violation of the Patient Brokering Act and Anti-Kickback Statute.

204.    In the claims identified in Exhibits "1" – "2" ,"4" – "5", "7 – 9", and "11", COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR Jacksonville, COR West Broward, COR Hollywood, COR Homestead, COR Pompano, Zapata, Mattos, Choxi, Sluhoski, and Hall routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant to an unlawful patient brokering and kickback scheme.

## 6.    The Fraudulent and Unlawful Charges for Interventional Pain Management Services at COR Jacksonville

205.    Pursuant to their unlawful patient brokering scheme, COR Jacksonville, Zapata, Hall, and Sluhoski caused many of the Insureds in the claims identified in Exhibit "6" to be subjected to medically unnecessary interventional pain management services, including but not limited to pain management injections and nerve destruction procedures.

206.    Choxi purported to perform almost all of the interventional pain management services, and COR Jacksonville, Zapata, Hall, and Sluhoski caused them to be billed through COR Jacksonville to GEICO under CPT codes 62321, 62323, 64490, 64491, 64492, 64493, 64494, 64495, 64633, 64634, 64635, 64636, 20553, 20610, and 20611, typically resulting in thousands of dollars of charges for each Insured who purportedly received the services.

207.    In the claims for interventional pain management services identified in Exhibit "6", the charges for the interventional pain management services were fraudulent in that they misrepresented COR Jacksonville's compliance with applicable law and eligibility to collect PIP Benefits in the first instance.

86

208.    In fact, and as set forth herein, COR Jacksonville never was eligible to collect PIP

Benefits, because it operated in violation of Florida law.

209.    COR Jacksonville, Zapata, Hall, and Sluhoski's claims for the interventional pain

management services also were fraudulent because they misrepresented the medical necessity of

the purported services.

210.    In a legitimate clinical setting, interventional pain management services such as

pain management injections and nerve destruction procedures should not be administered until a

patient has legitimately failed more conservative courses of treatment. This is because invasive

interventional pain management services pose a degree of risk to the patient that is absent in more

conservative forms of treatment.

211.    However, in order to maximize the fraudulent no-fault insurance billing that they

could submit to GEICO, COR Jacksonville, Zapata, Hall, and Sluhoski often purported to provide

invasive and medically unnecessary interventional pain management services to Insureds within

weeks the Insureds' accidents, before the Insureds had an opportunity to legitimately complete

more conservative treatments.

212.    For example:

(i)     On February 18, 2020, an Insured named GM was involved in an automobile
        accident. Then, on or about March 20, 2020, pursuant to the Defendants' unlawful
        referral arrangement, COR West Broward, Zapata, and Mattos caused GM to be
        referred from COR West Broward to COR Jacksonville. Thereafter, COR
        Jacksonville, Zapata, Hall, and Choxi purported to provide cervical and lumbar
        facet joint block injections to GM on March 31, 2020 – less than two months after
        the Insured's automobile accident and before the Insured could have failed a
        legitimate course of conservative treatment – and then billed the injections to
        GEICO under CPT codes 64490, 64491, and 64492.

(ii)    On March 2, 2020, an Insured named DD was involved in an automobile accident.
        Then, on or about March 24, 2020, pursuant to the Defendants' unlawful referral
        arrangement, COR Hollywood, Zapata, and Hall caused DD to be referred from
        COR Hollywood to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall,

and Choxi purported to provide a lumbar epidural steroid injection and lumbar facet joint block injections to DD on March 26, 2020 – less than one month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 62323, 64493, 64494, and 64495.

(iii)    On May 8, 2020, an Insured named GR was involved in an automobile accident. Then, on or about June 3, 2020, pursuant to the Defendants' unlawful referral arrangement, COR Homestead, Zapata, and Mattos caused GR to be referred from COR Homestead to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection, cervical epidural steroid injection, and lumbar facet joint block injections to GR on June 3, 2020 – less than one month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 62321, 62323, 64493, 64494, and 64495.

(iv)    On August 4, 2020, an Insured named JP was involved in an automobile accident. Then, on or about August 11, 2020, pursuant to the Defendants' unlawful referral arrangement, COR East Miami, Zapata, and Hall caused JP to be referred from COR East Miami to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a cervical epidural steroid injection and lumbar facet joint block injections to JP on September 11, 2020 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 62323, 64493, 64494, and 694495.

(v)    On January 13, 2021, an Insured named CZ was involved in an automobile accident. Then, on or about January 27, 2021, pursuant to the Defendants' unlawful referral arrangement, COR Homestead, Zapata, and Mattos caused CZ to be referred from COR Homestead to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a cervical epidural steroid injection and a lumbar epidural steroid injection to CZ on February 22, 2021 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 62321 and 62323.

(vi)    On September 8, 2021, an Insured named MG was involved in an automobile accident. Then, on or about October 13, 2021, pursuant to the Defendants' unlawful referral arrangement, COR West Broward, Zapata, and Choxi caused MG to be referred from COR West Broward to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide lumbar facet joint block injections to MG on November 4, 2021 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493 and 64494.

(vii)     On March 18, 2022, an Insured named IS was involved in an automobile accident. Then, on or about April 7, 2022, pursuant to the Defendants' unlawful referral arrangement, COR West Broward, Zapata, and Choxi caused IS to be referred from COR West Broward to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection to IS on April 25, 2022 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(viii)    On March 21, 2022, an Insured named KC was involved in an automobile accident. Then, on or about April 30, 2022, pursuant to the Defendants' unlawful referral arrangement, COR Kendall, Zapata, and Mattos caused KC to be referred from COR Kendall to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide lumbar facet joint block injections to KC on May 17, 2021 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493 and 64494.

(ix)      On July 4, 2022, an Insured named GM was involved in an automobile accident. Then, on or about August 26, 2022, pursuant to the Defendants' unlawful referral arrangement, COR West Broward, Zapata, and Choxi caused GM to be referred from COR Kendall to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide lumbar facet joint block injections to GM on August 30, 2022 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64493, 64494, and 64495.

(x)       On August 20, 2023, an Insured named BR was involved in an automobile accident. Then, on or about September 13, 2023, pursuant to the Defendants' unlawful referral arrangement, COR Hollywood, Zapata, and Hall caused BR to be referred from COR Hollywood to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection to BR on September 13, 2023 – less than one month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(xi)      On October 23, 2023, an Insured named MP was involved in an automobile accident. Then, on or about November 28, 2023, COR Pompano, Zapata, and Choxi caused MP to be referred from COR Pompano to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection to MP on December 19, 2023 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(xii)   On November 17, 2023, an Insured named KG was involved in an automobile accident. Then, on or about January 2, 2024, COR Hollywood, Zapata, and Hall, caused KG to be referred from COR Hollywood to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection to KG on January 2, 2024 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(xiii)   On January 18, 2024, an Insured named JC was involved in an automobile accident. Then, on or about February 19, 2024, COR East Miami, Zapata, and Hall caused JC to be referred from COR East Miami to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide a lumbar epidural steroid injection to JC on February 20, 2024 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT code 62323.

(xiv)   On February 9, 2024, an Insured named JF was involved in an automobile accident. Then, on or about March 11, 2024, COR West Broward, Zapata, and Choxi caused JF to be referred from COR West Broward to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Hall, and Choxi purported to provide cervical and lumbar facet joint block injections to JF on March 11, 2024 – less than two months after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injections to GEICO under CPT codes 64490, 64491, 64492, 64493, 64494, and 64495.

(xv)   On June 12, 2024, an Insured named MB was involved in an automobile accident. Then, on or about July 2, 2024, COR West Broward, Zapata, and Choxi caused MB to be referred from COR West Broward to COR Jacksonville. Thereafter, COR Jacksonville, Zapata, Sluhoski, and Choxi purported to provide a cervical epidural steroid injection to MB on July 8, 2024 – less than one month after the Insured's automobile accident and before the Insured could have failed a legitimate course of conservative treatment – and then billed the injection to GEICO under CPT 62321.

213.   These are only representative examples of the Defendants' fraudulent and unlawful charges for medically unwarranted interventional pain management services, which in most cases were the result of unlawful referrals of Insureds between and among the various COR Clinics, pursuant to the unlawful patient brokering scheme described herein.

**7.   The Violations of the Patient Brokering Act and Anti-Kickback Statute at TeleEMC, COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah,**

**COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, and COR West Palm**

214.    To the extent that the Insureds in the claims set forth in Exhibits "1" – "5", "7", "9" – "10", "12" – "13", and "15" suffered any injuries at all in their automobile accidents, they almost always were minor soft tissue injuries such as sprains or strains. These relatively minor soft tissue injuries did not constitute legitimate "emergency medical conditions".

215.    For instance, and in keeping with the fact that the Insureds identified in Exhibits "1" – "5", "7", "9" – "10", "12" – "13", and "15" did not legitimately suffer from "emergency medical conditions", in the substantial majority of the claims identified in Exhibits "1" – "5", "7", "9" – "10", "12" – "13", and "15" the Insureds did not seek treatment at any hospital as the result of their accidents.

216.    To the limited extent that the Insureds did report to a hospital after their accidents, they almost always were briefly observed on an outpatient basis and then discharged after a few hours with no serious injury diagnoses.

217.    Furthermore, in most cases, contemporaneous police reports indicated the underlying accidents involved minor collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

218.    COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, and Sluhoski knew that – unless physicians, physician assistants, or advanced practice registered nurses falsely reported that their patients suffered from "emergency medical conditions" – they would be limited to recovering $2,500.00 in PIP Benefits per patient, as opposed to the $10,000.00 per patient they could potentially recover if the patients had "emergency medical condition" diagnoses.

219. However, COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, and COR West Palm did not have enough physicians, physician assistants, or advanced practice registered nurses on staff to provide false "emergency medical condition" diagnoses to all of their patients.

220. At the same time, TeleEMC, Applebaum, and Kurzner (collectively the "TeleEMC Defendants") wanted to submit as much PIP billing as possible for expensive and medically unnecessary "emergency medical condition" examinations , "self care training" and "therapeutic activities", without regard for the fact that the Insureds had not suffered any injuries that would warrant these examinations, training, or therapeutic activities.

221. However, in order to bill GEICO and other insurers for medically unnecessary and illusory examinations, "self-care training", and "therapeutic activities", the TeleEMC Defendants needed to obtain patient referrals from other health care providers, such as COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, and COR West Palm.

222. Accordingly, the TeleEMC Defendants entered into secret and unlawful patient brokering agreements with COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, and Sluhoski, whereby:

(i) Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, and Sluhoski caused treating practitioners at COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, and COR West Palm to refer Insureds to TeleEMC for expensive and medically unnecessary examinations and "self-care training"; and

(ii) In exchange for these medically unnecessary referrals, the TeleEMC Defendants caused the Insureds to be falsely diagnosed with phony "emergency medical conditions" at TeleEMC, so as to enable COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead,

COR Kissimmee, COR Tampa, and COR West Palm to submit and obtain reimbursement on thousands of dollars in additional PIP claims, per Insured.

223. In reality, these were "pay-to-play" arrangements that caused COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, and Sluhoski to provide medically unnecessary patient referrals to the TeleEMC Defendants in violation of the Patient Brokering Act and Anti-Kickback Statute.

224. For example:

(i) On or about September 2021, COR Homestead, Zapata, and Mattos caused an Insured named OV to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Homestead, Zapata, and Mattos to submit additional PIP billing through COR Homestead in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(ii) On or about January 19, 2022, COR Orlando, Zapata, and El Kommos caused an Insured named NH to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC and Applebaum caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Orlando, Zapata, and El Kommos to submit additional PIP billing through COR Orlando in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(iii) On or about March 30, 2022, COR West Broward, Zapata, and Choxi caused an Insured named NC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC and Applebaum caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR West Broward, Zapata, and Choxi to submit additional PIP billing through COR Broward in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral

93

violated the Patient Brokering Act and Anti-Kickback Statute.

(iv)     On or about April 4, 2022, COR Kissimmee, Zapata, and El Kommos caused an Insured named GC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Kissimmee, Zapata, and El Kommos to submit additional PIP billing through COR Kissimmee in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(v)      On or about December 9, 2022, COR Kissimmee, Zapata, and Choxi caused an Insured named HC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Kissimmee, Zapata, and Choxi to submit additional PIP billing through COR Kissimmee in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(vi)     On or about May 2, 2023, COR Kendall, Zapata, and Mattos caused an Insured named FM to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Kendall, Zapata, and Mattos to submit additional PIP billing through COR Kendall in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(vii)    On or about May 9, 2023, COR East Miami, Zapata, and Hall caused an Insured named CA to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR East Miami, Zapata, and Hall to submit additional PIP billing through COR East Miami in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(viii)   On or about May 30, 2023, COR Homestead, Zapata, and Mattos caused an Insured named GV to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Homestead, Zapata, and Mattos to submit additional PIP billing through COR Homestead in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(ix)   On or about August 1, 2023, COR West Broward, Zapata, and Choxi caused an Insured named DC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR West Broward, Zapata, and Choxi to submit additional PIP billing through COR West Broward in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(x)   On or about August 1, 2023, COR Kissimmee, Zapata, and El Kommos caused an Insured named MG to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Kissimmee, Zapata, and El Kommos to submit additional PIP billing through COR Kissimmee in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xi)   On or about October 2, 2023, COR East Miami, Zapata, and Hall caused an Insured named JM to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR East Miami, Zapata, and Hall to submit additional PIP billing through COR East Miami in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xii)   On or about November 8, 2023, COR Tampa, Zapata, and Bowser caused an Insured named PB to be referred to TeleEMC for a medically unnecessary

"emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Tampa, Zapata, and Bowser to submit additional PIP billing through COR Tampa in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xiii)   On or about December 7, 2023, COR Tampa, Zapata, and Bowser caused an Insured named LP to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Tampa, Zapata, and Bowser to submit additional PIP billing through COR Tampa in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xiv)   On or about January 3, 2024, COR Tampa, Zapata, and Bowser caused an Insured named TL to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Tampa, Zapata, and Bowser to submit additional PIP billing through COR Tampa in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xv)   On or about January 16, 2024, COR West Broward, Zapata, and Choxi caused an Insured named JC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR West Broward, Zapata, and Choxi to submit additional PIP billing through COR West Broward in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xvi)   On or about January 21, 2024, COR Orlando, Zapata, and El Kommos caused an Insured named KL to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful

compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Orlando, Zapata, and El Kommos to submit additional PIP billing through COR Orlando in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xvii)   On or about January 22, 2024, COR Hialeah, Zapata, and Mattos caused an Insured named CP to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Hialeah, Zapata, and Mattos to submit additional PIP billing through COR Hialeah in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xviii)  On or about January 24, 2024, COR Orlando, Zapata, and El Kommos caused an Insured named JP to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Orlando, Zapata, and El Kommos to submit additional PIP billing through COR Orlando in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xix)   On or about January 30, 2024, COR East Miami, Zapata, and Hall caused an Insured named JC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR East Miami, Zapata, and Hall to submit additional PIP billing through COR East Miami in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xx)    On or about February 24, 2024, COR Orlando, Zapata, and El Kommos caused an Insured named VP to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which

enabled COR Orlando, Zapata, and El Kommos to submit additional PIP billing through COR Orlando in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xxi) On or about May 17, 2024, COR Kendall, Zapata, and Mattos caused an Insured named AL to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Kendall, Zapata, and Mattos to submit additional PIP billing through COR Kendall in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xxii) On or about July 2, 2024, COR Homestead, Zapata, and Grau caused an Insured named RV to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Homestead, Zapata, and Grau to submit additional PIP billing through COR Homestead in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xxiii) On or about July 18, 2024, COR Hialeah, Zapata, and Salado caused an Insured named HQ to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR Hialeah, Zapata, and Salado to submit additional PIP billing through COR Hialeah in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xxiv) On or about August 12, 2024, COR West Palm Beach, Zapata, and Sluhoski caused an Insured named HC to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR West Palm Beach, Zapata, and Sluhoski to submit additional PIP billing through COR West Palm Beach in connection with the medically

unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

(xxv)  On or about January 7, 2025, COR West Palm Beach, Zapata, and Sluhoski caused an Insured named CW to be referred to TeleEMC for a medically unnecessary "emergency medical condition" examination, "self care training", and "therapeutic activities", which then were billed through TeleEMC to GEICO. As unlawful compensation for the referral, TeleEMC, Applebaum, and Kurzner caused the Insured to be falsely diagnosed with an "emergency medical condition", which enabled COR West Palm Beach, Zapata, and Sluhoski to submit additional PIP billing through COR West Palm Beach in connection with the medically unnecessary chiropractic/physical therapy treatment that they purported to provide to the Insured. This referral violated the Patient Brokering Act and Anti-Kickback Statute.

225.  These are only representative examples. In the claims identified in Exhibits "1" – "5", "7", "9" – "10", "12" – "13" and "15", COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, Sluhoski, Applebaum, and Kurzner and unlawfully made and received patient referrals in exchange for compensation, in violation of the Patient Brokering Act and Anti-Kickback Statute.

226.  In this context, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

227.  An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

228.  It is improbable that any two or more Insureds involved in any one of the relatively minor automobile accidents in the claims identified in in Exhibits "1" – "5", "7", "9" – "10", "12" – "13" and "15" would: (i) suffer from injuries so similar that they would all require referrals from COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West

Broward, COR Homestead, COR Kissimmee, COR Tampa, or COR West Palm to TeleEMC on or about the same date after their common accident; and (ii) all legitimately suffer from "emergency medical conditions" warranting emergency medical condition diagnoses from TeleEMC.

229.    It is even more improbable – to the point of impossibility – that this would occur often within the cohort of Insureds who purportedly received treatment from in Exhibits "1" – "5", "7", "9" – "10", "12" – "13" and "15".

230.    Even so – and in keeping with the fact that the referrals from COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, and COR West Palm to TeleEMC were based upon unlawful compensation, rather than medical necessity – this repeatedly occurred within the cohort of Insureds who purportedly received treatment at COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, and TeleEMC.

231.    In the claims identified in Exhibits "1" – "5", "7", "9" – "10", "12" – "13" and "15", COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, Sluhoski, and the TeleEMC Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant to an illegal patient brokering scheme.

**8.    The Fraudulent Charges for "Emergency Medical Condition" Examinations at TeleEMC**

100

232.    After obtaining patient referrals pursuant to their unlawful patient brokering agreements with COR Kendall, COR East Miami, COR Orlando, COR North Miami, COR Hialeah, COR West Broward, COR Homestead, COR Kissimmee, COR Tampa, COR West Palm, Zapata, Mattos, Choxi, Hall, El Kommos, Bowser, Salado, Grau, and Sluhoski, as well as with their other patient referral sources, the TeleEMC Defendants purported to provide many of the Insureds in the claims identified in Exhibit "15" with an examination in order to provide the Insureds with predetermined and phony "emergency medical condition" diagnoses.

233.    As set forth in Exhibit "15", the substantial majority of the examinations were then billed by the TeleEMC Defendants through TeleEMC to GEICO under CPT code 99204, typically resulting in a charge of $500.00 for each putative examination.

234.    In the claims for examinations identified in Exhibit "15", the TeleEMC Defendants falsely represented that they were entitled to recover PIP Benefits in the first instance, when in fact they were not because they operated in violation of Florida law, as set forth herein.

235.    In the claims for examinations identified in Exhibit "15", the TeleEMC Defendants also misrepresented the nature, extent, and results of the examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

236.    To the extent that the Insureds in the claims identified in Exhibit "15" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

237.    For instance, in many of the claims identified in Exhibit "15", the Insureds did not seek treatment at any hospital as the result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibit "15" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged

101

with nothing more serious than a minor soft tissue injury diagnosis.

238.     Furthermore, in most of the claims identified in Exhibit "15", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

239.     Even so, in the claims for examinations identified in Exhibit "15", the TeleEMC Defendants billed for the putative examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity. In fact, the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems as the result of any automobile accidents at all at the time of the purported examinations.

240.     For example:

(i)      On March 2, 2021, an Insured named LB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LB's vehicle was drivable following the accident. The police report further indicated that LB was not injured and did not complain of any pain at the scene. In keeping with the fact that LB was not seriously injured, LB did not visit any hospital emergency room following the accident. To the extent that LB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of LB by Sobel on April 15, 2021, TeleEMC and Applebaum billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)     On May 12, 2021, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured and did not complain of any pain at the scene. In keeping with the fact that JM was not seriously injured, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of JM by Kelly on May 25, 2021, TeleEMC and Applebaum billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)    On October 27, 2021, an Insured named SF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SF's vehicle was drivable following the accident. The police report further indicated that SF was not injured and did not complain of any pain at the scene. In keeping with the fact that SF was not seriously injured, SF did not visit any hospital emergency room following the accident. To the extent that SF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of SF by Sobel on December 20, 2021, TeleEMC and Applebaum billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)    On October 25, 2022, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. In keeping with the fact that BJ was not seriously injured, BJ did not visit any hospital emergency room following the accident. To the extent that BJ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of BJ by M. Fernandez on December 5, 2022, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)    On April 8, 2023, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured and did not complain of any pain at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of LA by Carolina Fernandez, P.A. ("C. Fernandez") on May 5, 2023, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)    On January 24, 2024, an Insured named NN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that NN's vehicle was drivable following the accident. The police report further indicated that NN was not injured and did not complain of any pain at the scene. In keeping with the fact that NN was not seriously injured, NN did not visit any hospital emergency room following the accident. To the extent that NN experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of NN by Healthcote

on March 7, 2024, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)     On April 18, 2024, an Insured named BN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that BN's vehicle was drivable following the accident. The police report further indicated that BN was not injured and did not complain of any pain at the scene. In keeping with the fact that BN was not seriously injured, BN did not visit any hospital emergency room following the accident. To the extent that BN experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of BN by Kurzner on April 22, 2024, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On October 18, 2024, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JD's vehicle was drivable following the accident. The police report further indicated that JD was not injured and did not complain of any pain at the scene. In keeping with the fact that JD was not seriously injured, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of JD by Ramos on October 28, 2024, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)      On March 2, 2025, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of AR by Castillo on March 27, 2025, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)       On April 3, 2025, an Insured named BW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that BW's vehicle was drivable following the accident. The police report further indicated that BW was not injured and did not complain of any pain at the scene. In keeping with the fact that BW was not seriously injured, BW did not visit any hospital emergency room following the accident. To the extent that

BW experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported examination of BW by Kurzner on April 10, 2025, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

241. These are only representative examples. In the claims for examinations identified in Exhibit "15", the TeleEMC Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the TeleEMC Defendants and their referral sources purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

242. What is more, in the claims identified in Exhibit "15", the charges for the examinations under CPT code 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent providing the examinations.

243. Pursuant to the CPT Assistant, when the TeleEMC Defendants billed for their purported examinations using CPT code 99204, they represented that the physicians and other health care practitioners who performed the underlying examinations spent at least 45 minutes performing the examinations.

244. In fact, in the examinations identified in Exhibit "15", the health care practitioners who purported to perform the examinations on behalf of TeleEMC never spent more than 15-20 minutes performing the examinations, much less 30 minutes.

245. For instance, and in keeping with the fact that the initial examinations allegedly provided through TeleEMC did not involve more than 15-20 minutes of time to perform, the

examining practitioners used templates in purporting to conduct the initial examinations.

246.    All that was required to complete the templates was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

247.    These brief interviews and examinations did not require any examining health care practitioner associated with TeleEMC to spend more than 15-20 minutes performing the putative initial examinations.

248.    Moreover, the purported examinations in the claims identified in Exhibit "15" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false "emergency medical condition" diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining practitioners to spend more than 15-20 minutes performing the putative initial examinations.

249.    In the claims for initial examinations that are identified in Exhibit "15", the TeleEMC Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of the Medical Decision-Making During the Purported Examinations**

250.    Furthermore, and pursuant to the CPT Assistant, when the TeleEMC Defendants billed GEICO for the examinations identified in Exhibit "15", they falsely represented that the practitioners who purported to perform the examinations on behalf of TeleEMC engaged in some legitimate moderate complexity medical decision-making in connection with the examinations.

251.    In actuality, the purported examinations did not involve legitimate medical decision-making at all.

252. Rather, in the claims for examinations identified in Exhibit "15": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the TeleEMC Defendants and their associates did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for almost every Insured, as well as false "emergency medical condition" diagnoses for almost every Insured, regardless of their true individual circumstances or presentation.

253. For example:

(i)     On May 1, 2021, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LD's vehicle was drivable following the accident. The police report further indicated that LD was not injured and did not complain of any pain at the scene. In keeping with the fact that LD was not seriously injured, LD did not visit any hospital emergency room following the accident. To the extent that LD experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on June 2, 2021, Heathcote purported to conduct an initial examination of LD at TeleEMC. To the extent that Heathcote performed the examination in the first instance, Heathcote did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Heathcote did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Heathcote provided LD with substantially the same false "emergency medical condition" diagnosis, and false list of objectively unverifiable soft tissue injury "diagnoses", that she provided to other Insureds. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD by TeleEMC, Applebaum, Burack, and Heathcote presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by TeleEMC, Applebaum, Burack, and Heathcote consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LD. Even so, TeleEMC and Applebaum billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Heathcote engaged in

some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On October 27, 2021, an Insured named SF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SF's vehicle was drivable following the accident. The police report further indicated that SF was not injured and did not complain of any pain at the scene. In keeping with the fact that SF was not seriously injured, SF did not visit any hospital emergency room following the accident. To the extent that SF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on December 20, 2021, Sobel purported to conduct an initial examination of SF at TeleEMC. To the extent that Sobel performed the examination in the first instance, Sobel did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sobel did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sobel provided SF with substantially the same false "emergency medical condition" diagnosis, and false list of objectively unverifiable soft tissue injury "diagnoses", that she provided to other Insureds. Furthermore, neither SF's presenting problems, nor the treatment plan provided to SF by TeleEMC, Applebaum, Burack, and Sobel presented any risk of significant complications, morbidity, or mortality. To the contrary, SF did not need any significant treatment at all as a result of the accident, and the treatment plan provided by TeleEMC, Applebaum, Burack, and Sobel consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to SF. Even so, TeleEMC and Applebaum billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sobel engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On September 14, 2023, an Insured named JZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that JZ's vehicle was drivable following the accident. The police report further indicated that JZ was not injured and did not complain of any pain at the scene. In keeping with the fact that JZ was not seriously injured, JZ did not visit any hospital emergency room following the accident. To the extent that JZ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on September 28, 2023, Heathcote purported to conduct an initial examination of JZ at TeleEMC. To the extent that Heathcote performed the examination in the first instance, Heathcote did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Heathcote did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Heathcote provided JZ with substantially the same false "emergency medical condition" diagnosis, and false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither JZ's presenting problems, nor the treatment plan provided to

JZ by TeleEMC, Applebaum, Kurzner, and Heathcote presented any risk of significant complications, morbidity, or mortality. To the contrary, JZ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by TeleEMC, Applebaum, Kurzner, and Heathcote consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JZ. Even so, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Heathcote engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)     On December 25, 2023, an Insured named KP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KP's vehicle was drivable following the accident. The police report further indicated that KP was not injured and did not complain of any pain at the scene. In keeping with the fact that KP was not seriously injured, KP did not visit any hospital emergency room following the accident. To the extent that KP experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 9, 2024, Kurzner purported to conduct an initial examination of KP at TeleEMC. To the extent that Kurzner performed the examination in the first instance, Kurzner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kurzner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kurzner provided KP with substantially the same false "emergency medical condition" diagnosis, and false list of objectively unverifiable soft tissue injury "diagnoses", that he provided to other Insureds. Furthermore, neither KP's presenting problems, nor the treatment plan provided to KP by TeleEMC, Applebaum, and Kurzner presented any risk of significant complications, morbidity, or mortality. To the contrary, KP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by TeleEMC, Applebaum, and Kurzner consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to KP. Even so, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kurzner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On April 29, 2024, an Insured named AL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AL's vehicle was drivable following the accident. The police report further indicated that AL was not injured and did not complain of any pain at the scene. In keeping with the fact that AL was not seriously injured, AL did not visit any hospital emergency room following the accident. To the extent that AL experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on May 17, 2024, Kurzner purported to conduct an initial examination of AL at TeleEMC. To the extent that Kurzner performed the

examination in the first instance, Kurzner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kurzner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kurzner provided AL with substantially the same false "emergency medical condition" diagnosis, and false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AL's presenting problems, nor the treatment plan provided to AL by TeleEMC, Applebaum, and Kurzner presented any risk of significant complications, morbidity, or mortality. To the contrary, AL did not need any significant treatment at all as a result of the accident, and the treatment plan provided by TeleEMC, Applebaum, and Kurzner consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AL. Even so, TeleEMC, Applebaum, and Kurzner billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kurzner engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

254.     These are only representative examples. In the claims identified in Exhibit "15", the TeleEMC Defendants routinely falsely represented that the purported examinations involved legitimate moderate complexity medical decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

255.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

256.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

257.     As set forth herein, in the claims identified in Exhibit "15", almost all of the Insureds whom the TeleEMC Defendants purported to treat were involved in relatively minor accidents.

258.     It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "15" would suffer substantially similar

injuries as the result of their accidents, or require a substantially similar course of treatment.

259.    It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "15" would present for an initial examination with substantially similar symptoms, and receive substantially similar diagnoses, on or about the exact same date after their underlying automobile accident.

260.    It is even more improbable – to the point of impossibility – that this kind of pattern would recur with frequency among the Insureds who purportedly received examinations from TeleEMC.

261.    Even so, in keeping with the fact that the TeleEMC Defendants' putative "diagnoses" were pre-determined and false, the TeleEMC Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

262.    For example:

(i)     On June 26, 2020, four Insureds – RG, JG, AG, and AG – were involved in the same automobile accident. Thereafter, all four Insureds presented at TeleEMC for examinations on the exact same date, June 27, 2020. At the conclusion of the purported initial examinations, TeleEMC caused RG, JG, AG, and AG to be provided with false, substantially similar soft tissue injury and emergency medical condition "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii)    On July 18, 2020, three Insureds – AD, RD, and CM – were involved in the same automobile accident. Thereafter, all three Insureds presented at TeleEMC for examinations on the exact same date, July 30, 2020. At the conclusion of the purported initial examinations, TeleEMC caused AD, RD, and CM to be provided with false, substantially similar soft tissue injury and emergency medical condition "diagnoses", and to be recommended a substantially similar course of medically

unnecessary treatment.

(iii)     On August 30, 2021, two Insureds – JC and LC – were involved in the same automobile accident. Thereafter, both Insureds presented at TeleEMC for examinations on the exact same date, October 1, 2021. At the conclusion of the purported initial examinations, TeleEMC and Applebaum caused JC and LC to be provided with false, substantially similar soft tissue injury and emergency medical condition "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv)     On September 22, 2023, three Insureds – RG, LV, and WV – were involved in the same automobile accident. Thereafter, all three Insureds presented at TeleEMC for examinations on the exact same date, October 30, 2023. At the conclusion of the purported initial examinations, TeleEMC, Applebaum, and Kurzner caused RG, LV, and WV to be provided with false, substantially similar soft tissue injury and emergency medical condition "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v)     On December 31, 2024, three Insureds – AL, OL, and SL – were involved in the same automobile accident. Thereafter, all three Insureds presented at TeleEMC for initial examinations on the exact same date, January 10, 2025. At the conclusion of the purported initial examinations, TeleEMC, Applebaum, and Kurzner caused AL, OL, and SL to be provided with false, substantially similar soft tissue injury and emergency medical condition "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

263.     These are only representative examples. In the claims for initial examinations that are identified in Exhibit "15", the TeleEMC Defendants frequently caused substantially similar "diagnosis" to be issued – on or about the same date – to more than one Insured involved in a single accident, and caused the Insureds to be recommended a substantially similar course of medically unnecessary "treatment", despite the fact that each of the Insureds were differently situated and, in any case, did not require the treatment.

264.     In the claims for initial examinations identified in Exhibit "15", the TeleEMC Defendants routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at higher rates than examinations

112

that do not require any complex medical decision-making at all.

265. In the claims for initial examinations identified in Exhibit "15", the TeleEMC Defendants routinely misrepresented the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

    (i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

    (ii)    the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

    (iii)    TeleEMC was never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinic was unlawfully operated in violation of Florida Law.

## 9. The Fraudulent and Unbundled Charges for "Self Care Training" and "Therapeutic Activities" at TeleEMC

266. To maximize their fraudulent charges for their falsified initial examinations, in the claims identified in Exhibit "15", the TeleEMC Defendants frequently unbundled separate charges for medically useless and illusory "self care training" and "therapeutic activities" under CPT codes 97535 and 97530, together with their examination charges under CPT codes 99204.

267. Sobel, Heathcote, Lacosse, Kelly, Fernandez, Ramos, Castillo, and other treating practitioners at TeleEMC purported to perform – at the direction of the TeleEMC Defendants –the purported self care training and therapeutic activities in the claims identified in Exhibit "15".

268. The TeleEMC Defendants' charges for purported self-care training and therapeutic activities were fraudulent in that they misrepresented TeleEMC's eligibility to collect PIP Benefits in the first instance.

269. In fact, and as set forth herein, TeleEMC never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of Florida law.

113

270.    The charges for the purported self-care training and therapeutic activities in the claims identified in Exhibit "15" also falsely represented the nature, extent, and reimbursability of the services.

271.    The use of CPT code 97535 to bill for self-care training represents, among other things, that the treating practitioner spent at least 15 minutes of time – separate and apart from any contemporaneously provided examination – for the purpose of instructing the patient in managing his or her injury at home and preventing secondary injury.

272.    The use of CPT code 97530 to bill for therapeutic activities represents, among other things, that the treating practitioner spent at least 15 minutes of time – separate and apart from any contemporaneously provided examination – guiding the patient through dynamic activities that help the patient with daily tasks like lifting, bending, and carrying.

273.    None of the treating practitioners at TeleEMC legitimately provided 15 minutes of self-care training or therapeutic activities to the Insureds in the claims identified in Exhibit "15" separate from the examinations that they contemporaneously purported to provide to the Insureds and billed to GEICO using CPT code 99204. Instead, at the conclusion of their purported examinations, the treating practitioners at TeleEMC simply handed the Insureds pre-printed flyers with instructions on exercise and stretching.

274.    To the extent that the TeleEMC Defendants provided any self-care training or therapeutic activities at all in the claims identified in Exhibit "15", these services were part and parcel of the initial examinations that they contemporaneously purported to provide to the Insureds on the same dates of service as the supposed self-care training and therapeutic activities, and did not constitute any legitimate service separate from the examinations that they billed to GEICO under CPT code 99204.

275.    In the claims identified in Exhibit "15", the TeleEMC Defendants routinely unbundled separate charges under CPT codes 97535 and 97530 for illusory self-care training and therapeutic activities from their already-fraudulent examination charges under CPT code 99204 in order to maximize the fraudulent and unlawful billing they could submit to GEICO.

**C.     The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Co-Payments or Deductibles from Their Patients**

276.    The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the COR Clinics and TeleEMC, for medically unnecessary treatment.

277.    Accordingly, as part and parcel of their fraudulent and unlawful scheme, Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

278.    In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) that the Defendants submitted to GEICO through the COR Clinics and TeleEMC, respectively, for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patients.

279.    In the claims identified in Exhibits "1" – "15", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because Defendants engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance

Claims Statute.

**D.    The Unlawful Operation of the COR Clinics Without Legitimate Medical Directors**

280.    Because the COR Clinics were each clinics that were subject to the Clinic Act, Zapata could not lawfully operate the COR Clinics unless he obtained clinic licenses for each of the COR Clinics, and unless the COR Clinics employed licensed physicians as their medical directors, who actually performed the required duties of clinic medical directors.

281.    However, if Zapata retained legitimate physicians to serve as the COR Clinics' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent and unlawful schemes.

282.    Accordingly:

(i)     Zapata recruited Mattos and Choxi, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Kendall, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii)    Zapata recruited Hall, Mattos, and Choxi, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR East Miami, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iii)   Zapata recruited El Kommos, Choxi, and Bowser, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Orlando, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iv)    Zapata recruited Mattos and Choxi, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR North Miami, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(v)     Zapata recruited Mattos and Salado, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Hialeah, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(vi)     Zapata recruited Hall, Rizzolo, Sluhoski, and Bowser, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Jacksonville, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(vii)    Zapata recruited Mattos and Choxi, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR West Broward, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(viii)   Zapata recruited Hall and Sluhoski, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Hollywood, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ix)     Zapata recruited Mattos, Grau, and Salado, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Homestead, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(x)      Zapata recruited El Kommos, Choxi, and Bowser, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR Kissimmee, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(xi)     Zapata recruited Choxi, a licensed physician, who was willing to falsely pose as the legitimate medical director at COR Pompano, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(xii)    Zapata recruited Bowser, a licensed physician, who was willing to falsely pose as the legitimate medical director at COR Tampa, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(xiii)   Zapata recruited Choxi and Sluhoski, licensed physicians, who were willing to falsely pose as the legitimate medical directors at COR West Palm, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(xiv)    Zapata recruited Sluhoski, a licensed physician, who was willing to falsely pose as the legitimate medical director at COR Lake Worth, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

117

283.     However, Mattos, Choxi, Hall, El Kommos, Bowser, Sluhoski, Salado, Rizzolo, and Grau (collectively the "COR Clinic Medical Director Defendants") were never genuine medical directors for the respective COR Clinics.

284.     Instead, from the beginning of the Clinic Medical Director Defendants' association with the respective COR Clinics, they ceded all day-to-day decision-making and oversight regarding health care services to Zapata.

285.     In keeping with the fact that the Clinic Medical Director Defendants were never genuine medical directors at the COR Clinics, the Clinic Medical Director Defendants never legitimately conducted systematic reviews of each of the COR Clinics' respective billings to ensure that the billings were not fraudulent or unlawful, and instead permitted each of the COR Clinics to operate in the fraudulent and unlawful manner described herein.

286.     Moreover, at COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, and COR Homestead, Mattos, Choxi, Hall, Salado, Grau, and Sluhoski did not ensure that all health care practitioners at the clinics had active appropriate certification or licensure for the level of care being provided, and instead permitted the clinics to bill for "physical therapy" services that had been performed – to the extent that they had been performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law.

287.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, the Clinic Medical Director Defendants never provided legitimate, day-to-day supervision at any of the COR Clinics, and – in fact – only occasionally were present at the respective clinics, if at all.

288.     For instance, COR Kendall's March 2024 clinic licensing application represented

118

that Mattos was only present at COR Kendall "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

289.    Likewise, COR Kendall's August 2024 clinic licensing application represented that Choxi was only present at COR Kendall "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

290.    COR East Miami's August 2023 and September 2023 clinic licensing applications represented that Hall was only present at COR East Miami "8 Hours per month".

291.    COR East Miami's June 2024 clinic licensing application represented that Mattos was only present at COR East Miami "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

292.    COR Orlando's February 2023 clinic licensing application represented that El Kommos was only present at COR Orlando "8 HRS PER MONTH".

293.    Likewise, COR Orlando's March 2024 and April 2024 clinic licensing applications represented that Bowser was only present at COR Orlando "8 HRS PER MONTH".

294.    COR North Miami's July 2024 clinic licensing application represented that Choxi was only present at COR North Miami "1 X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

295.    COR Jacksonville's October 2020 clinic licensing application represented that Hall was only present at COR Jacksonville "once a month".

296.    Likewise, COR Jacksonville's June 2024 clinic licensing application represented that Sluhoski was only present at COR Jacksonville "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

297.    COR Jacksonville's October 2024 clinic licensing application represented that

Rizzolo was only present at COR Jacksonville "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

298.    COR Hollywood's June 2024 clinic licensing application represented that Sluhoski was only present at COR Hollywood "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

299.    COR Homestead's September 2023 clinic licensing application represented that Mattos was only present at COR Homestead "once a month".

300.    Likewise, COR Homestead's August 2024 clinic licensing application represented that Grau was only present at COR Homestead "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

301.    COR Kissimmee's February 2023 clinic licensing application represented that El Kommos was only present at COR Kissimmee "8 HRS PER MONTH".

302.    Likewise, COR Kissimmee's May 2024 clinic licensing application represented that Bowser was only present at COR Kissimmee "1X A MONTH".

303.    COR Pompano's October 2023 clinic licensing application represented that Choxi was only present at COR Pompano "20 hours per month".

304.    Moreover, COR Tampa's April 2023 clinic licensing application represented that Bowser was only present at COR Tampa "20 hours per month".

305.    COR West Palm's June 2024 clinic licensing application represented that Sluhoski was only present at COR West Palm "1X A MONTH TO PERFORM MEDICAL DIRECTOR DUTIES".

306.    Similarly, COR Lake Worth's October 2024 clinic licensing application represented that Sluhoski was only present at COR Lake Worth "1X A MONTH TO PERFORM

MEDICAL DIRECTOR DUTIES".

307.    In the claims identified in Exhibits "1" – "14", the COR Clinics, Zapata, Mattos, Choxi, Hall, El Kommos, Salado, Rizzolo, Bowser, Sluhoski, and Grau falsely represented that the COR Clinics were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

308.    In fact, none of the COR Clinics were in compliance with the Clinic Act, and thus none of the COR Clinics were eligible to receive PIP reimbursement.

**E.     The Unlawful Operation of TeleEMC Without a Legitimate Medical Director**

309.    Likewise, because TeleEMC was a clinic that was subject to the Clinic Act, Applebaum could not lawfully operate TeleEMC unless he obtained a clinic license for TeleEMC, and unless TeleEMC employed licensed physicians as its medical director, who actually performed the required duties of clinic medical directors.

310.    However, if Applebaum retained a legitimate physician to serve as TeleEMC's medical director, any such legitimate physician actually would be obligated to fulfill the statutory and regulatory requirements applicable to a clinic medical director, which would impede the Defendants' fraudulent scheme.

311.    Accordingly, Applebaum recruited Burack and Kurzner, licensed physicians, who were willing to falsely pose as the legitimate medical directors at TeleEMC, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

312.    Burack and Kurzner were never genuine medical directors for TeleEMC.

313.    Instead, from the beginning of Burack and Kurzner's respective association with TeleEMC, they ceded all day-to-day decision-making and oversight regarding health care services to Applebaum.

314.     In keeping with the fact that Burack and Kurzner were never genuine medical directors at TeleEMC, Burack and Kurzner never legitimately conducted systematic reviews of TeleEMC's billings to ensure that the billing was not fraudulent or unlawful, and instead permitted TeleEMC to operate in the fraudulent and unlawful manner described herein.

315.     What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Burack and Kurzner never provided legitimate day-to-day supervision at TeleEMC, and – in fact – only occasionally were present at TeleEMC, if at all.

316.     In the claims identified in Exhibit "15", the TeleEMC Defendants falsely represented that TeleEMC was in compliance with the Clinic Act and eligible to receive PIP reimbursement.

317.     In fact, TeleEMC was not in compliance with the Clinic Act, and thus was not eligible to receive PIP reimbursement.

**III.     The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO**

318.     To support their fraudulent charges, the Defendants systematically submitted – or caused to be submitted – thousands of HCFA-1500 forms and treatment reports to GEICO through the COR Clinics and TeleEMC – containing thousands of individual charges – seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive

319.     The claims that the Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted – or caused to be submitted – by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)     The HCFA-1500 forms and treatment reports submitted – or caused to be submitted

– by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)    The HCFA-1500 forms and treatment reports submitted – or caused to be submitted – by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

320.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

321.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

322.    For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

323.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently were never performed in the first instance.

324.    COR Kendall, COR East Miami, COR North Miami, COR Hialeah, COR West Broward, COR Hollywood, COR Homestead, Zapata, Mattos, Choxi, Hall, Sluhoski, and Salado

knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

325.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

326.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $26,000,000.00.

327.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the COR Clinics and TeleEMC
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

328.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

329.    There is an actual case and controversy between GEICO and the COR Clinics and TeleEMC regarding more $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

330.    The COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO because the COR Clinics and TeleEMC were unlawfully operated in

violation of Florida law.

331.    The COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided nor billed to GEICO.

332.    The COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

333.    The COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

334.    The COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

335.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the COR Clinics and TeleEMC have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

336.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

337.    COR Kendall is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

338.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Kendall's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Kendall was not eligible to receive under the No-Fault Law because: (i) COR Kendall was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

339.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

340.    COR Kendall's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Kendall, inasmuch as COR Kendall was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order

for COR Kendall to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Kendall and Zapata continue to attempt collection on the fraudulent billing submitted through COR Kendall to the present day.

341.    COR Kendall is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Kendall in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

342.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,640,000.00 pursuant to the fraudulent bills submitted through the COR Kendall enterprise.

343.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**
**Against Zapata, Mattos, and Choxi**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

344.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

345.    COR Kendall is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

346.    Zapata, Mattos, and Choxi were employed by – or associated with – the COR Kendall enterprise.

347.    Zapata, Mattos, and Choxi knowingly have agreed, combined, and conspired to

conduct and/or participate in, directly or indirectly, the conduct of COR Kendall's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Kendall was not eligible to receive under the No-Fault Law because: (i) COR Kendall was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

348.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

349.    Zapata, Mattos, and Choxi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

350.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,640,000.00 pursuant to the fraudulent bills

submitted through the COR Kendall enterprise.

351.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### FOURTH CAUSE OF ACTION
### Against COR Kendall, Zapata, Mattos, and Choxi
### (Under Fla. Stat. §§ 501.201 et seq.)

352.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

353.    COR Kendall, Zapata, Mattos, and Choxi are actively engaged in trade and commerce in the State of Florida.

354.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

355.    COR Kendall, Zapata, Mattos, and Choxi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

356.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Kendall, Zapata, Mattos, and Choxi were fraudulent in that they misrepresented: (i) COR Kendall's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

357.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Kendall, Zapata, Mattos, and Choxi has been materially injurious to GEICO and its Insureds.

358.    The conduct of COR Kendall, Zapata, Mattos, and Choxi was the actual and proximate cause of the damages sustained by GEICO.

359.    COR Kendall, Zapata, Mattos, and Choxi's unfair and deceptive acts have caused GEICO to sustain damages of at least $3,640,000.00.

360.    By reason of COR Kendall, Zapata, Mattos, and Choxi's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### FIFTH CAUSE OF ACTION
**Against COR Kendall, Zapata, Mattos, and Choxi**
**(Common Law Fraud)**

361.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

362.    COR Kendall, Zapata, Mattos, and Choxi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Kendall for the Fraudulent Services.

363.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Kendall was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

364.    COR Kendall, Zapata, Mattos, and Choxi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Kendall that were not reimbursable.

365.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,640,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Kendall, Zapata, Mattos, and Choxi through COR Kendall.

366.    COR Kendall, Zapata, Mattos, and Choxi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

367.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## SIXTH CAUSE OF ACTION
### Against COR Kendall, Zapata, Mattos, and Choxi
### (Unjust Enrichment)

368.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

369.    As set forth above, COR Kendall, Zapata, Mattos, and Choxi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

370.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Kendall, Zapata, Mattos, and Choxi through COR Kendall, it reasonably believed that it was legally obligated to make such payments based on COR Kendall, Zapata, Mattos, and Choxi's

improper, unlawful, and/or unjust acts.

371.    COR Kendall, Zapata, Mattos, and Choxi have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Kendall, Zapata, Mattos, and Choxi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

372.    COR Kendall, Zapata, Mattos, and Choxi's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

373.    By reason of the above, COR Kendall, Zapata, Mattos, and Choxi have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,640,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

374.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

375.    COR East Miami is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

376.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR East Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR East Miami was not eligible to receive under the No-Fault Law because: (i) COR East Miami was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols

designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

377.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

378.    COR East Miami's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR East Miami, inasmuch as COR East Miami was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR East Miami to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR East Miami and Zapata continue to attempt collection on the fraudulent billing submitted through COR East Miami to the present day.

379.    COR East Miami is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR East Miami in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

380.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills

submitted through the COR East Miami enterprise.

381. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## EIGHTH CAUSE OF ACTION
### Against Zapata, Hall, Mattos, and Choxi
### (Violation of RICO, 18 U.S.C. § 1962(d))

382. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

383. COR East Miami is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

384. Zapata, Hall, Mattos, and Choxi were employed by – or associated with – the COR East Miami enterprise.

385. Zapata, Hall, Mattos, and Choxi knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR East Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR East Miami was not eligible to receive under the No-Fault Law because: (i) COR East Miami was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were

subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

386.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

387.    Zapata, Hall, Mattos, and Choxi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

388.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills submitted through the COR East Miami enterprise.

389.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## NINTH CAUSE OF ACTION
### Against COR East Miami, Zapata, Hall, Mattos, and Choxi
### (Under Fla. Stat. §§ 501.201 et seq.)

390.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

391.    COR East Miami, Zapata, Hall, Mattos, and Choxi are actively engaged in trade and commerce in the State of Florida.

392.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

393.    COR East Miami, Zapata, Hall, Mattos, and Choxi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

394.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR East Miami, Zapata, Hall, Mattos, and Choxi were fraudulent in that they misrepresented: (i) COR East Miami's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

395.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR East Miami, Zapata, Hall, Mattos, and Choxi has been materially injurious to GEICO and its Insureds.

396.    The conduct of COR East Miami, Zapata, Hall, Mattos, and Choxi was the actual and proximate cause of the damages sustained by GEICO.

397.    COR East Miami, Zapata, Hall, Mattos, and Choxi's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,180,000.00.

398.    By reason of COR East Miami, Zapata, Hall, Mattos, and Choxi's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TENTH CAUSE OF ACTION
**Against COR East Miami, Zapata, Hall, Mattos, and Choxi**
**(Common Law Fraud)**

399.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

400.    COR East Miami, Zapata, Hall, Mattos, and Choxi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR East Miami for the Fraudulent Services.

401.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR East Miami was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

402.    COR East Miami, Zapata, Hall, Mattos, and Choxi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR East Miami that were not reimbursable.

403.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR East Miami, Zapata, Hall, Mattos, and Choxi through COR East Miami.

404.    COR East Miami, Zapata, Hall, Mattos, and Choxi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to

recover punitive damages.

405.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**ELEVENTH CAUSE OF ACTION**
**Against COR East Miami, Zapata, Hall, Mattos, and Choxi**
**(Unjust Enrichment)**

406.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

407.    As set forth above, COR East Miami, Zapata, Hall, Mattos, and Choxi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

408.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR East Miami, Zapata, Hall, Mattos, and Choxi through COR East Miami, it reasonably believed that it was legally obligated to make such payments based on COR East Miami, Zapata, Hall, Mattos, and Choxi's improper, unlawful, and/or unjust acts.

409.    COR East Miami, Zapata, Hall, Mattos, and Choxi have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit COR East Miami, Zapata, Hall, Mattos, and Choxi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

410.    COR East Miami, Zapata, Hall, Mattos, and Choxi's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

411.    By reason of the above, COR East Miami, Zapata, Hall, Mattos, and Choxi have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,180,000.00.

## TWELFTH CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

412.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

413.     COR Orlando is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

414.     Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Orlando's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Orlando was not eligible to receive under the No-Fault Law because: (i) COR Orlando was unlawfully operated in violation Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

415.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

416.     COR Orlando's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Orlando, inasmuch as COR Orlando was not engaged in a legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Orlando to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Orlando and Zapata continue to attempt collection on the fraudulent billing submitted through COR Orlando to the present day.

417.     COR Orlando is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Orlando in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

418.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,110,000.00 pursuant to the fraudulent bills submitted through COR Orlando.

419.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTEENTH CAUSE OF ACTION
**Against Zapata, El Kommos, Choxi, and Bowser**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

420.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

421.     COR Orlando is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

140

1961(4), that engages in activities that affect interstate commerce.

422.    Zapata, El Kommos, Choxi, and Bowser were employed by – or associated with – the COR Orlando enterprise.

423.    Zapata, El Kommos, Choxi, and Bowser knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Orlando's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Orlando was not eligible to receive under the No-Fault Law because: (i) COR Orlando was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

424.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

425.    Zapata, El Kommos, Choxi, and Bowser knew of, agreed to, and acted in

furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

426.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,110,000.00 pursuant to the fraudulent bills submitted through the COR Orlando enterprise.

427.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## FOURTEENTH CAUSE OF ACTION
### Against COR Orlando, Zapata, El Kommos, Choxi, and Bowser
### (Under Fla. Stat. §§ 501.201 et seq.)

428.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

429.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser are actively engaged in trade and commerce in the State of Florida.

430.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

431.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

432.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Orlando, Zapata, El Kommos, Choxi, and Bowser were fraudulent in that they misrepresented: (i) COR Orlando's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent

Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

433.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Orlando, Zapata, El Kommos, Choxi, and Bowser has been materially injurious to GEICO and its Insureds.

434.    The conduct of COR Orlando, Zapata, El Kommos, Choxi, and Bowser was the actual and proximate cause of the damages sustained by GEICO.

435.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,110,000.00.

436.    By reason of COR Orlando, Zapata, El Kommos, Choxi, and Bowser's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTEENTH CAUSE OF ACTION**
**Against COR Orlando, Zapata, El Kommos, Choxi, and Bowser**
**(Common Law Fraud)**

437.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

438.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Orlando for the Fraudulent Services.

439.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Orlando was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not;

(ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

440.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Orlando that were not reimbursable.

441.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,110,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Orlando, Zapata, El Kommos, Choxi, and Bowser through COR Orlando.

442.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

443.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTEENTH CAUSE OF ACTION**
**Against COR Orlando, Zapata, El Kommos, Choxi, and Bowser**
**(Unjust Enrichment)**

444.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-327, above.

445.    As set forth above, COR Orlando, Zapata, El Kommos, Choxi, and Bowser have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

446.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Orlando, Zapata, El Kommos, Choxi, and Bowser through COR Orlando, it reasonably believed that it was legally obligated to make such payments based on COR Orlando, Zapata, El Kommos, Choxi, and Bowser's improper, unlawful, and/or unjust acts.

447.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Orlando, Zapata, El Kommos, Choxi, and Bowser voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

448.    COR Orlando, Zapata, El Kommos, Choxi, and Bowser's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

449.    By reason of the above, COR Orlando, Zapata, El Kommos, Choxi, and Bowser have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,110,000.00.

**SEVENTEENTH CAUSE OF ACTION**
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

450.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

451.    COR North Miami is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

452.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the

conduct of COR North Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR North Miami was not eligible to receive under the No-Fault Law because: (i) COR North Miami was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

453.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

454.    COR North Miami's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR North Miami, inasmuch as COR North Miami was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR North Miami to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR North Miami and Zapata continue to attempt collection on the fraudulent

billing submitted through COR North Miami to the present day.

455.    COR North Miami is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR North Miami in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

456.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,850,000.00 pursuant to the fraudulent bills submitted through the COR North Miami enterprise.

457.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTEENTH CAUSE OF ACTION**
**Against Zapata, Mattos, and Choxi**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

458.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

459.    COR North Miami is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

460.    Zapata, Mattos, and Choxi were employed by – or associated with – the COR North Miami enterprise.

461.    Zapata, Mattos, and Choxi knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR North Miami's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud

statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR North Miami was not eligible to receive under the No-Fault Law because: (i) COR North Miami was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

462.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

463.    Zapata, Mattos, and Choxi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

464.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,850,000.00 pursuant to the fraudulent bills submitted through the COR North Miami enterprise.

465.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**NINETEENTH CAUSE OF ACTION**
**Against COR North Miami, Zapata, Mattos, and Choxi**
**(Under Fla. Stat. §§ 501.201 et seq.)**

466.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

467.    COR North Miami, Zapata, Mattos, and Choxi are actively engaged in trade and commerce in the State of Florida.

468.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

469.    COR North Miami, Zapata, Mattos, and Choxi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

470.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR North Miami, Zapata, Mattos, and Choxi were fraudulent in that they misrepresented: (i) COR North Miami's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

471.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR North Miami, Zapata, Mattos, and Choxi has been materially injurious to GEICO and its Insureds.

472.    The conduct of COR North Miami, Zapata, Mattos, and Choxi was the actual and proximate cause of the damages sustained by GEICO.

149

473.     COR North Miami, Zapata, Mattos, and Choxi's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,850,000.00.

474.     By reason of COR North Miami, Zapata, Mattos, and Choxi's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## TWENTIETH CAUSE OF ACTION
### Against COR North Miami, Zapata, Mattos, and Choxi
### (Common Law Fraud)

475.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

476.     COR North Miami, Zapata, Mattos, and Choxi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR North Miami for the Fraudulent Services.

477.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR North Miami was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

478.     COR North Miami, Zapata, Mattos, and Choxi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to

induce GEICO to pay charges submitted through COR North Miami that were not reimbursable.

479.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,850,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR North Miami, Zapata, Mattos, and Choxi through COR North Miami.

480.    COR North Miami, Zapata, Mattos, and Choxi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

481.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FIRST CAUSE OF ACTION**
**Against COR North Miami, Zapata, Mattos, and Choxi**
**(Unjust Enrichment)**

482.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

483.    As set forth above, COR North Miami, Zapata, Mattos, and Choxi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

484.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR North Miami, Zapata, Mattos, and Choxi through COR North Miami, it reasonably believed that it was legally obligated to make such payments based on COR North Miami, Zapata, Mattos, and Choxi's improper, unlawful, and/or unjust acts.

485.    COR North Miami, Zapata, Mattos, and Choxi have been enriched at GEICO's

expense by GEICO's payments, which constituted a benefit that COR North Miami, Zapata, Mattos, and Choxi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

486.    COR North Miami, Zapata, Mattos, and Choxi's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

487.    By reason of the above, COR North Miami, Zapata, Mattos, and Choxi have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,850,000.00.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

488.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

489.    COR Hialeah is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

490.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Hialeah's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Hialeah was not eligible to receive under the No-Fault Law because: (i) COR Hialeah was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who

purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

491.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

492.    COR Hialeah's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Hialeah, inasmuch as COR Hialeah was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Hialeah to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Hialeah and Zapata continue to attempt collection on the fraudulent billing submitted through COR Hialeah to the present day.

493.    COR Hialeah is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Hialeah in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

494.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,990,000.00 pursuant to the fraudulent bills submitted through the COR Hialeah enterprise.

495.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Zapata, Mattos, and Salado**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

496.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

497.    COR Hialeah is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

498.    Zapata, Mattos, and Salado were employed by – or associated with – the COR Hialeah enterprise.

499.    Zapata, Mattos, and Salado knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Hialeah's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Hialeah was not eligible to receive under the No-Fault Law because: (i) COR Hialeah was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated

154

the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

500.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

501.    Zapata, Mattos, and Salado knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

502.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,990,000.00 pursuant to the fraudulent bills submitted through the COR Hialeah enterprise.

503.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against COR Hialeah, Zapata, Mattos, and Salado**
**(Under Fla. Stat. §§ 501.201 et seq.)**

504.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

505.    COR Hialeah, Zapata, Mattos, and Salado are actively engaged in trade and commerce in the State of Florida.

506.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

507.    COR Hialeah, Zapata, Mattos, and Salado engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

508.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Hialeah, Zapata, Mattos, and Salado were fraudulent in that they misrepresented: (i) COR Hialeah's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

509.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Hialeah, Zapata, Mattos, and Salado has been materially injurious to GEICO and its Insureds.

510.    The conduct of COR Hialeah, Zapata, Mattos, and Salado was the actual and proximate cause of the damages sustained by GEICO.

511.    COR Hialeah, Zapata, Mattos, and Salado's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,990,000.00.

512.    By reason of COR Hialeah, Zapata, Mattos, and Salado's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TWENTY-FIFTH CAUSE OF ACTION
**Against COR Hialeah, Zapata, Mattos, and Salado**
**(Common Law Fraud)**

513.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

514.    COR Hialeah, Zapata, Mattos, and Salado intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in

the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Hialeah for the Fraudulent Services.

515.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Hialeah was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

516.    COR Hialeah, Zapata, Mattos, and Salado intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Hialeah that were not reimbursable.

517.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,990,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Hialeah, Zapata, Mattos, and Salado through COR Hialeah.

518.    COR Hialeah, Zapata, Mattos, and Salado's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

519.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-SIXTH CAUSE OF ACTION
### Against COR Hialeah, Zapata, Mattos, and Salado
### (Unjust Enrichment)

520.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

521.    As set forth above, COR Hialeah, Zapata, Mattos, and Salado have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

522.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Hialeah, Zapata, Mattos, and Salado through COR Hialeah, it reasonably believed that it was legally obligated to make such payments based on COR Hialeah, Zapata, Mattos, and Salado's improper, unlawful, and/or unjust acts.

523.    COR Hialeah, Zapata, Mattos, and Salado have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Hialeah, Zapata, Mattos, and Salado voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

524.    COR Hialeah, Zapata, Mattos, and Salado's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

525.    By reason of the above, COR Hialeah, Zapata, Mattos, and Salado have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,990,000.00.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

526.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

527. COR Jacksonville is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

528. Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Jacksonville's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Jacksonville was not eligible to receive under the No-Fault Law because: (i) COR Jacksonville was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

529. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

530. COR Jacksonville's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Jacksonville, inasmuch as COR Jacksonville was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential

in order for COR Jacksonville to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Jacksonville and Zapata continue to attempt collection on the fraudulent billing submitted through COR Jacksonville to the present day.

531.     COR Jacksonville is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Jacksonville in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

532.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills submitted through the COR Jacksonville enterprise.

533.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### TWENTY-EIGHTH CAUSE OF ACTION
#### Against Zapata, Hall, Sluhoski, Rizzolo, and Bowser
#### (Violation of RICO, 18 U.S.C. § 1962(d))

534.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

535.     COR Jacksonville is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

536.     Zapata, Hall, Sluhoski, Rizzolo, and Bowser were employed by – or associated with – the COR Jacksonville enterprise.

537.    Zapata, Hall, Sluhoski, Rizzolo, and Bowser knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Jacksonville's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Jacksonville was not eligible to receive under the No-Fault Law because: (i) COR Jacksonville was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

538.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

539.    Zapata, Hall, Sluhoski, Rizzolo, and Bowser knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

161

540.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills submitted through the COR Jacksonville enterprise.

541.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-NINTH CAUSE OF ACTION
### Against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser
### (Under Fla. Stat. §§ 501.201 et seq.)

542.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

543.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser are actively engaged in trade and commerce in the State of Florida.

544.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

545.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

546.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser were fraudulent in that they misrepresented: (i) COR Jacksonville's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

547.    Such acts and practices offend public policy and are immoral, unethical, oppressive,

and unscrupulous. Additionally, the conduct of COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser has been materially injurious to GEICO and its Insureds.

548.    The conduct of COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser was the actual and proximate cause of the damages sustained by GEICO.

549.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser's unfair and deceptive acts have caused GEICO to sustain damages of at least $780,000.00.

550.    By reason of COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**THIRTIETH CAUSE OF ACTION**
**Against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser**
**(Common Law Fraud)**

551.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

552.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Jacksonville for the Fraudulent Services.

553.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Jacksonville was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the

163

representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

554.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Jacksonville that were not reimbursable.

555.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser through COR Jacksonville.

556.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

557.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTY-FIRST OF ACTION
**Against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser**
**(Unjust Enrichment)**

558.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

559.    As set forth above, COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser

have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

560.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser through COR Jacksonville, it reasonably believed that it was legally obligated to make such payments based on COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser's improper, unlawful, and/or unjust acts.

561.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

562.    COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

563.    By reason of the above, COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser have been unjustly enriched in an amount to be determined at trial, but in no event less than $780,000.00.

## THIRTY-SECOND CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

564.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

565.    COR West Broward is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

566.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR West Broward's affairs through a pattern of racketeering activity consisting of

repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR West Broward was not eligible to receive under the No-Fault Law because: (i) COR West Broward was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

567.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

568.    COR West Broward's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR West Broward, inasmuch as COR West Broward was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR West Broward to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR West Broward and Zapata continue to attempt collection on the fraudulent billing submitted through COR West Broward to the present day.

166

569.    COR West Broward is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR West Broward in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

570.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,700,000.00 pursuant to the fraudulent bills submitted through the COR West Broward enterprise.

571.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTY-THIRD CAUSE OF ACTION
**Against Zapata, Mattos, and Choxi**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

572.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

573.    COR West Broward is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

574.    Zapata, Mattos, and Choxi were employed by – or associated with – the COR West Broward enterprise.

575.    Zapata, Mattos, and Choxi knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR West Broward's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be

submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR West Broward was not eligible to receive under the No-Fault Law because: (i) COR West Broward was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

576.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

577.    Zapata, Mattos, and Choxi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

578.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,700,000.00 pursuant to the fraudulent bills submitted through the COR West Broward enterprise.

579.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this

Court deems just, proper, and equitable.

## THIRTY-FOURTH CAUSE OF ACTION
### Against COR West Broward, Zapata, Mattos, and Choxi
### (Under Fla. Stat. §§ 501.201 et seq.)

580.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

581.     COR West Broward, Zapata, Mattos, and Choxi are actively engaged in trade and commerce in the State of Florida.

582.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

583.     COR West Broward, Zapata, Mattos, and Choxi engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

584.     The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR West Broward, Zapata, Mattos, and Choxi were fraudulent in that they misrepresented: (i) COR West Broward's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

585.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR West Broward, Zapata, Mattos, and Choxi has been materially injurious to GEICO and its Insureds.

586.     The conduct of COR West Broward, Zapata, Mattos, and Choxi was the actual and proximate cause of the damages sustained by GEICO.

587.     COR West Broward, Zapata, Mattos, and Choxi's unfair and deceptive acts have

caused GEICO to sustain damages of at least $4,700,000.00.

588.     By reason of COR West Broward, Zapata, Mattos, and Choxi's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**THIRTY-FIFTH CAUSE OF ACTION**
**Against COR West Broward, Zapata, Mattos, and Choxi**
**(Common Law Fraud)**

589.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

590.     COR West Broward, Zapata, Mattos, and Choxi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR West Broward for the Fraudulent Services.

591.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR West Broward was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

592.     COR West Broward, Zapata, Mattos, and Choxi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR West Broward that were not reimbursable.

593.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,700,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR West Broward, Zapata, Mattos, and Choxi through COR West Broward.

594.     COR West Broward, Zapata, Mattos, and Choxi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

595.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**THIRTY-SIXTH CAUSE OF ACTION**
**Against COR West Broward, Zapata, Mattos, and Choxi**
**(Unjust Enrichment)**

596.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

597.     As set forth above, COR West Broward, Zapata, Mattos, and Choxi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

598.     When GEICO paid the bills and charges submitted – or caused to be submitted – by COR West Broward, Zapata, Mattos, and Choxi, it reasonably believed that it was legally obligated to make such payments based on COR West Broward, Zapata, Mattos, and Choxi's improper, unlawful, and/or unjust acts.

599.     COR West Broward, Zapata, Mattos, and Choxi have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR West Broward, Zapata,

Mattos, and Choxi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

600.    COR West Broward, Zapata, Mattos, and Choxi's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

601.    By reason of the above, COR West Broward, Zapata, Mattos, and Choxi have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,700,000.00.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

602.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

603.    COR Hollywood is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

604.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Hollywood's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Hollywood was not eligible to receive under the No-Fault Law because: (i) COR Hollywood was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were

172

never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

605.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

606.    COR Hollywood's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Hollywood, inasmuch as COR Hollywood was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Hollywood to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Hollywood and Zapata continue to attempt collection on the fraudulent billing submitted through COR Hollywood to the present day.

607.    COR Hollywood is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Hollywood in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

608.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,210,000.00 pursuant to the fraudulent bills submitted through the COR Hollywood enterprise.

609.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTY-EIGHTH CAUSE OF ACTION
**Against Zapata, Hall, and Sluhoski**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

610.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

611.    COR Hollywood is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

612.    Zapata, Hall, and Sluhoski were employed by – or associated with – the COR Hollywood enterprise.

613.    Zapata, Hall, and Sluhoski knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Hollywood's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Hollywood was not eligible to receive under the No-Fault Law because: (i) COR Hollywood was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and

174

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

614.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8". Each such mailing was made in furtherance of the mail fraud scheme.

615.    Zapata, Hall, and Sluhoski knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

616.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,210,000.00 pursuant to the fraudulent bills submitted through the COR Hollywood enterprise.

617.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### THIRTY-NINTH CAUSE OF ACTION
### Against COR Hollywood, Zapata, Hall, and Sluhoski
### (Under Fla. Stat. §§ 501.201 et seq.)

618.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

619.    COR Hollywood, Zapata, Hall, and Sluhoski are actively engaged in trade and commerce in the State of Florida.

620.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

621.    COR Hollywood, Zapata, Hall, and Sluhoski engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

622. The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Hollywood, Zapata, Hall, and Sluhoski were fraudulent in that they misrepresented: (i) COR Hollywood's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

623. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Hollywood, Zapata, Hall, and Sluhoski has been materially injurious to GEICO and its Insureds.

624. The conduct of COR Hollywood, Zapata, Hall, and Sluhoski was the actual and proximate cause of the damages sustained by GEICO.

625. COR Hollywood, Zapata, Hall, and Sluhoski's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,210,000.00.

626. By reason of COR Hollywood, Zapata, Hall, and Sluhoski's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FORTIETH CAUSE OF ACTION
### Against COR Hollywood, Zapata, Hall, and Sluhoski
### (Common Law Fraud)

627. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

628. COR Hollywood, Zapata, Hall, and Sluhoski intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Hollywood for the Fraudulent Services.

629.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Hollywood was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

630.    COR Hollywood, Zapata, Hall, and Sluhoski intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Hollywood that were not reimbursable.

631.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,210,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Hollywood, Zapata, Hall, and Sluhoski through COR Hollywood.

632.    COR Hollywood, Zapata, Hall, and Sluhoski's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

633.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### FORTY-FIRST CAUSE OF ACTION
#### Against COR Hollywood, Zapata, Hall, and Sluhoski
#### (Unjust Enrichment)

634.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

635.    As set forth above, COR Hollywood, Zapata, Hall, and Sluhoski have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

636.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Hollywood, Zapata, Hall, and Sluhoski through COR Hollywood, it reasonably believed that it was legally obligated to make such payments based on COR Hollywood, Zapata, Hall, and Sluhoski's improper, unlawful, and/or unjust acts.

637.    COR Hollywood, Zapata, Hall, and Sluhoski have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Hollywood, Zapata, Hall, and Sluhoski voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

638.    COR Hollywood, Zapata, Hall, and Sluhoski's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

639.    By reason of the above, COR Hollywood, Zapata, Hall, and Sluhoski have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,210,000.00.

### FORTY-SECOND CAUSE OF ACTION
#### Against Zapata
#### (Violation of RICO, 18 U.S.C. § 1962(c))

640.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-327, above.

641.    COR Homestead is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

642.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Homestead's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Homestead was not eligible to receive under the No-Fault Law because: (i) COR Homestead was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

643.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9".

644.    COR Homestead's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Homestead, inasmuch as COR Homestead was

not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Homestead to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Homestead and Zapata continue to attempt collection on the fraudulent billing submitted through COR Homestead to the present day.

645.    COR Homestead is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Homestead in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

646.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,160,000.00 pursuant to the fraudulent bills submitted through the COR Homestead enterprise.

647.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FORTY-THIRD CAUSE OF ACTION**
**Against Zapata, Mattos, Grau, and Salado**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

648.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

649.    COR Homestead is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

650.    Zapata, Mattos, Grau, and Salado were employed by – or associated with – the COR

180

Homestead enterprise.

651.    Zapata, Mattos, Grau, and Salado knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Homestead's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that COR Homestead was not eligible to receive under the No-Fault Law because: (i) COR Homestead was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

652.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9". Each such mailing was made in furtherance of the mail fraud scheme.

653.    Zapata, Mattos, Grau, and Salado knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

654.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,160,000.00 pursuant to the fraudulent bills submitted through the COR Homestead enterprise.

655.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FORTY-FOURTH CAUSE OF ACTION**
**Against COR Homestead, Zapata, Mattos, Grau, and Salado**
**(Under Fla. Stat. §§ 501.201 et seq.)**

656.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

657.    COR Homestead, Zapata, Mattos, Grau, and Salado are actively engaged in trade and commerce in the State of Florida.

658.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

659.    COR Homestead, Zapata, Mattos, Grau, and Salado engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

660.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Homestead, Zapata, Mattos, Grau, and Salado were fraudulent in that they misrepresented: (i) COR Homestead's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

661.    Such acts and practices offend public policy and are immoral, unethical, oppressive,

and unscrupulous. Additionally, the conduct of COR Homestead, Zapata, Mattos, Grau, and Salado has been materially injurious to GEICO and its Insureds.

662.    The conduct of COR Homestead, Zapata, Mattos, and Salado was the actual and proximate cause of the damages sustained by GEICO.

663.    COR Homestead, Zapata, Mattos, Grau, and Salado's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,160,000.00.

664.    By reason of COR Homestead, Zapata, Mattos, Grau, and Salado's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FORTY-FIFTH CAUSE OF ACTION**
**Against COR Homestead, Zapata, Mattos, Grau, and Salado**
**(Common Law Fraud)**

665.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

666.    COR Homestead, Zapata, Mattos, Grau, and Salado intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Homestead for the Fraudulent Services.

667.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Homestead was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the

183

representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

668.    COR Homestead, Zapata, Mattos, Grau, and Salado intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Homestead that were not reimbursable.

669.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,160,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Homestead, Zapata, Mattos, Grau, and Salado through COR Homestead.

670.    COR Homestead, Zapata, Mattos, and Salado's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

671.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### FORTY-SIXTH CAUSE OF ACTION
**Against COR Homestead, Zapata, Mattos, Grau, and Salado**
**(Unjust Enrichment)**

672.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

673.    As set forth above, COR Homestead, Zapata, Mattos, Grau, and Salado have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

674.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Homestead, Zapata, Mattos, Grau, and Salado through COR Homestead, it reasonably believed that it was legally obligated to make such payments based on COR Homestead, Zapata, Mattos, Grau, and Salado's improper, unlawful, and/or unjust acts.

675.    COR Homestead, Zapata, Mattos, Grau, and Salado have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Homestead, Zapata, Mattos, Grau, and Salado voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

676.    COR Homestead, Zapata, Mattos, Grau, and Salado's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

677.    By reason of the above, COR Homestead, Zapata, Mattos, Grau, and Salado have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,160,000.00.

## FORTY-SEVENTH CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

678.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

679.    COR Kissimmee is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

680.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Kissimmee's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a

continuous basis for over three years seeking payments that COR Kissimmee was not eligible to receive under the No-Fault Law because: (i) COR Kissimmee was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

681.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10".

682.    COR Kissimmee's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Kissimmee, inasmuch as COR Kissimmee was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Kissimmee to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Kissimmee and Zapata continue to attempt collection on the fraudulent billing submitted through COR Kissimmee to the present day.

683.    COR Kissimmee is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.

These inherently unlawful acts are taken by COR Kissimmee in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

684.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,890,000.00 pursuant to the fraudulent bills submitted through the COR Kissimmee enterprise.

685.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### FORTY-EIGHTH CAUSE OF ACTION
**Against Zapata, El Kommos, Choxi, and Bowser**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

686.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

687.    COR Kissimmee is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

688.    Zapata, El Kommos, Choxi, and Bowser were employed by – or associated with – the COR Kissimmee enterprise.

689.    Zapata, El Kommos, Choxi, and Bowser knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Kissimmee's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that COR Kissimmee was not eligible to receive under the No-Fault Law

because: (i) COR Kissimmee was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

690.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10". Each such mailing was made in furtherance of the mail fraud scheme.

691.    Zapata, El Kommos, Choxi, and Bowser knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

692.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,890,000.00 pursuant to the fraudulent bills submitted through the COR Kissimmee enterprise.

693.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## FORTY-NINTH CAUSE OF ACTION
### Against COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser
### (Under Fla. Stat. §§ 501.201 et seq.)

694.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

695.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser are actively engaged in trade and commerce in the State of Florida.

696.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

697.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

698.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser were fraudulent in that they misrepresented: (i) COR Kissimmee's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

699.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser has been materially injurious to GEICO and its Insureds.

700.    The conduct of COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser was the actual and proximate cause of the damages sustained by GEICO.

701.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,890,000.00.

702.     By reason of COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTIETH CAUSE OF ACTION**
**Against COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser**
**(Common Law Fraud)**

703.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

704.     COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Kissimmee for the Fraudulent Services.

705.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Kissimmee was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

706.     COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Kissimmee that were not reimbursable.

707.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,890,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser through COR Kissimmee.

708.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

709.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## FIFTY-FIRST CAUSE OF ACTION
### Against COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser
### (Unjust Enrichment)

710.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

711.    As set forth above, COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

712.    When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser through COR Kissimmee, it reasonably believed that it was legally obligated to make such payments based on COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser's improper, unlawful, and/or unjust acts.

713.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Kissimmee,

Zapata, El Kommos, Choxi, and Bowser voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

714.    COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

715.    By reason of the above, COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,890,000.00.

**FIFTY-SECOND CAUSE OF ACTION**
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

716.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

717.    COR Pompano is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

718.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Pompano's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that COR Pompano was not eligible to receive under the No-Fault Law because: (i) COR Pompano was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who

purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

719.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11".

720.    COR Pompano's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in Zapata operated COR Pompano, inasmuch as COR Pompano was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Pompano to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Pompano and Zapata continue to attempt collection on the fraudulent billing submitted through COR Pompano to the present day.

721.    COR Pompano is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Pompano in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

722.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $680,000.00 pursuant to the fraudulent bills submitted through the COR Pompano enterprise.

723.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## FIFTY-THIRD CAUSE OF ACTION
### Against Zapata and Choxi
### (Violation of RICO, 18 U.S.C. § 1962(d))

724.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

725.    COR Pompano is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

726.    Zapata and Choxi were employed by – or associated with – the COR Pompano enterprise.

727.    Zapata and Choxi knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Pompano's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that COR Pompano was not eligible to receive under the No-Fault Law because: (i) COR Pompano was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated

the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

728.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11". Each such mailing was made in furtherance of the mail fraud scheme.

729.   Zapata and Choxi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

730.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $680,000.00 pursuant to the fraudulent bills submitted through the COR Pompano enterprise.

731.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FIFTY-FOURTH CAUSE OF ACTION**
**Against COR Pompano, Zapata, and Choxi**
**(Under Fla. Stat. §§ 501.201 et seq.)**

732.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

733.   COR Pompano, Zapata, and Choxi are actively engaged in trade and commerce in the State of Florida.

734.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

735.   COR Pompano, Zapata, and Choxi engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

736.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Pompano, Zapata, and Choxi were fraudulent in that they misrepresented: (i) COR Pompano's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

737.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR Pompano, Zapata, and Choxi has been materially injurious to GEICO and its Insureds.

738.    The conduct of COR Pompano, Zapata, and Choxi was the actual and proximate cause of the damages sustained by GEICO.

739.    COR Pompano, Zapata, and Choxi's unfair and deceptive acts have caused GEICO to sustain damages of at least $680,000.00.

740.    By reason of COR Pompano, Zapata, and Choxi's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTY-FIFTH CAUSE OF ACTION
### Against COR Pompano, Zapata, and Choxi
### (Common Law Fraud)

741.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

742.    COR Pompano, Zapata, and Choxi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Pompano for the Fraudulent Services.

743.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Pompano was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

744.     COR Pompano, Zapata, and Choxi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Pompano that were not reimbursable.

745.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $680,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Pompano, Zapata, and Choxi through COR Pompano.

746.     COR Pompano, Zapata, and Choxi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

747.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### FIFTY-SIXTH CAUSE OF ACTION
**Against COR Pompano, Zapata, and Choxi**
**(Unjust Enrichment)**

748.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

749.     As set forth above, COR Pompano, Zapata, and Choxi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

750.     When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Pompano, Zapata, and Choxi through COR Pompano, it reasonably believed that it was legally obligated to make such payments based COR Pompano, Zapata, and Choxi's improper, unlawful, and/or unjust acts.

751.     COR Pompano, Zapata, and Choxi have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Pompano, Zapata, and Choxi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

752.     COR Pompano, Zapata, and Choxi's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

753.     By reason of the above, COR Pompano, Zapata, and Choxi have been unjustly enriched in an amount to be determined at trial, but in no event less than $680,000.00.

### FIFTY-SEVENTH CAUSE OF ACTION
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

754.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

755.    COR Tampa is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

756.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Tampa's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over two years seeking payments that COR Tampa was not eligible to receive under the No-Fault Law because: (i) COR Tampa was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

757.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12".

758.    COR Tampa's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Tampa, inasmuch as COR Tampa was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR

Tampa to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Tampa and Zapata continue to attempt collection on the fraudulent billing submitted through COR Tampa to the present day.

759.    COR Tampa is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Tampa in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

760.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $940,000.00 pursuant to the fraudulent bills submitted through the COR Tampa enterprise.

761.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FIFTY-EIGHTH CAUSE OF ACTION**
**Against Zapata and Bowser**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

762.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

763.    COR Tampa is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

764.    Zapata and Bowser were employed by – or associated with – the COR Tampa enterprise.

765.    Zapata and Bowser knowingly have agreed, combined, and conspired to conduct

and/or participate in, directly or indirectly, the conduct of COR Tampa's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over three years seeking payments that COR Tampa was not eligible to receive under the No-Fault Law because: (i) COR Tampa was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

766.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12". Each such mailing was made in furtherance of the mail fraud scheme.

767.    Zapata and Bowser knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

768.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $940,000.00 pursuant to the fraudulent bills submitted through the COR Tampa enterprise.

769.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## FIFTY-NINTH CAUSE OF ACTION
### Against COR Tampa, Zapata, and Bowser
### (Under Fla. Stat. §§ 501.201 et seq.)

770.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

771.     COR Tampa, Zapata, and Bowser are actively engaged in trade and commerce in the State of Florida.

772.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

773.     COR Tampa, Zapata, and Bowser engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

774.     The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Tampa, Zapata, and Bowser were fraudulent in that they misrepresented: (i) COR Tampa's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

775.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct COR Tampa, Zapata, and Bowser has been materially injurious to GEICO and its Insureds.

776.     The conduct of COR Tampa, Zapata, and Bowser was the actual and proximate cause of the damages sustained by GEICO.

777.    COR Tampa, Zapata, and Bowser's unfair and deceptive acts have caused GEICO to sustain damages of at least $940,000.00.

778.    By reason of COR Tampa, Zapata, and Bowser's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SIXTIETH CAUSE OF ACTION**
**Against COR Tampa, Zapata, and Bowser**
**(Common Law Fraud)**

779.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

780.    COR Tampa, Zapata, and Bowser intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Tampa for the Fraudulent Services.

781.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Tampa was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

782.    COR Tampa, Zapata, and Bowser intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay

charges submitted through COR Tampa that were not reimbursable.

783.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $940,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Tampa, Zapata, and Bowser through COR Tampa.

784.   COR Tampa, Zapata, and Bowser's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

785.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTY-FIRST CAUSE OF ACTION**
**Against COR Tampa, Zapata, and Bowser**
**(Unjust Enrichment)**

786.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

787.   As set forth above, COR Tampa, Zapata, and Bowser have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

788.   When GEICO paid the bills and charges submitted – or caused to be submitted – by COR Tampa, Zapata, and Bowser through COR Tampa, it reasonably believed that it was legally obligated to make such payments based on COR Tampa, Zapata, and Bowser's improper, unlawful, and/or unjust acts.

789.   COR Tampa, Zapata, and Bowser have been enriched at GEICO's expense by

GEICO's payments, which constituted a benefit that COR Tampa, Zapata, and Bowser voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

790.    COR Tampa, Zapata, and Bowser's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

791.    By reason of the above, COR Tampa, Zapata, and Bowser have been unjustly enriched in an amount to be determined at trial, but in no event less than $940,000.00.

## SIXTY-SECOND CAUSE OF ACTION
### Against Zapata
### (Violation of RICO, 18 U.S.C. § 1962(c))

792.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

793.    COR West Palm is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

794.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR West Palm's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over one year seeking payments that COR West Palm was not eligible to receive under the No-Fault Law because: (i) COR West Palm was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were

never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

795.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13".

796.    COR West Palm's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR West Palm, inasmuch as COR West Palm was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR West Palm to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR West Palm and Zapata continue to attempt collection on the fraudulent billing submitted through COR West Palm to the present day.

797.    COR West Palm is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR West Palm in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

798.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted through the COR West Palm enterprise.

799.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTY-THIRD CAUSE OF ACTION
**Against Zapata, Choxi, and Sluhoski**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

800.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

801.   COR West Palm is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

802.   Zapata, Choxi, and Sluhoski were employed by – or associated with – the COR West Palm enterprise.

803.   Zapata, Choxi, and Sluhoski knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR West Palm's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over one year seeking payments that COR West Palm was not eligible to receive under the No-Fault Law because: (i) COR West Palm was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and

207

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

804.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13". Each such mailing was made in furtherance of the mail fraud scheme.

805.    Zapata, Choxi, and Sluhoski knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

806.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted through the COR West Palm enterprise.

807.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTY-FOURTH CAUSE OF ACTION
**Against COR West Palm, Zapata, Choxi, and Sluhoski**
**(Under Fla. Stat. §§ 501.201 et seq.)**

808.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

809.    COR West Palm, Zapata, Choxi, and Sluhoski are actively engaged in trade and commerce in the State of Florida.

810.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

811.    COR West Palm, Zapata, Choxi, and Sluhoski engaged in unfair, deceptive, and

unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

812.   The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR West Palm, Zapata, Choxi, and Sluhoski were fraudulent in that they misrepresented: (i) COR West Palm's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

813.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of COR West Palm, Zapata, Choxi, and Sluhoski has been materially injurious to GEICO and its Insureds.

814.   The conduct of COR West Palm, Zapata, Choxi, and Sluhoski was the actual and proximate cause of the damages sustained by GEICO.

815.   COR West Palm, Zapata, and Sluhoski's unfair and deceptive acts have caused GEICO to sustain damages of at least $240,000.00.

816.   By reason of COR West Palm, Zapata, Choxi, and Sluhoski's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### SIXTY-FIFTH CAUSE OF ACTION
#### Against COR West Palm, Zapata, Choxi, and Sluhoski
#### (Common Law Fraud)

817.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

818.   COR West Palm, Zapata, Choxi, and Sluhoski intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR West Palm for the Fraudulent Services.

819.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR West Palm was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

820.    COR West Palm, Zapata, Choxi, and Sluhoski intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR West Palm that were not reimbursable.

821.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR West Palm, Zapata, Choxi, and Sluhoski through COR West Palm.

822.    COR West Palm, Zapata, Choxi, and Sluhoski's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

823.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, along with such other and further relief as this
Court deems just, proper, and equitable.

### SIXTY-SIXTH CAUSE OF ACTION
**Against COR West Palm, Zapata, Choxi, and Sluhoski**
**(Unjust Enrichment)**

824.    GEICO incorporates, as though fully set forth herein, each and every allegation in
paragraphs 1-327, above.

825.    As set forth above, COR West Palm, Zapata, Choxi, and Sluhoski have engaged in
improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

826.    When GEICO paid the bills and charges submitted – or caused to be submitted –
by COR West Palm, Zapata, Choxi, and Sluhoski through COR West Palm, it reasonably believed
that it was legally obligated to make such payments based on COR West Palm, Zapata, Choxi, and
Sluhoski's improper, unlawful, and/or unjust acts.

827.    COR West Palm, Zapata, Choxi, and Sluhoski have been enriched at GEICO's
expense by GEICO's payments, which constituted a benefit that COR West Palm, Zapata, Choxi,
and Sluhoski voluntarily accepted notwithstanding their improper, unlawful, and unjust billing
scheme.

828.    COR West Palm, Zapata, Choxi, and Sluhoski's retention of GEICO's payments
violates fundamental principles of justice, equity, and good conscience.

829.    By reason of the above, COR West Palm, Zapata, Choxi, and Sluhoski have been
unjustly enriched in an amount to be determined at trial, but in no event less than $240,000.00.

### SIXTY-SEVENTH CAUSE OF ACTION
**Against Zapata**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

830.    GEICO incorporates, as though fully set forth herein, each and every allegation in

211

paragraphs 1-327, above.

831.    COR Lake Worth is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

832.    Zapata has knowingly conducted and/or participated in, directly or indirectly, the conduct of COR Lake Worth's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for approximately one year seeking payments that COR Lake Worth was not eligible to receive under the No-Fault Law because: (i) COR Lake Worth was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

833.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14".

834.    COR Lake Worth's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapata operated COR Lake Worth, inasmuch as COR Lake Worth

was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for COR Lake Worth to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that COR Lake Worth and Zapata continue to attempt collection on the fraudulent billing submitted through COR Lake Worth to the present day.

835.    COR Lake Worth is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by COR Lake Worth in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

836.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $110,000.00 pursuant to the fraudulent bills submitted through the COR Lake Worth enterprise.

837.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTY-EIGHTH CAUSE OF ACTION**
**Against Zapata and Sluhoski**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

838.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

839.    COR Lake Worth is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

840.    Zapata and Sluhoski were employed by – or associated with – the COR Lake Worth

213

enterprise.

841.    Zapata and Sluhoski knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of COR Lake Worth's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for approximately one year seeking payments that COR Lake Worth was not eligible to receive under the No-Fault Law because: (i) COR Lake Worth was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

842.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14". Each such mailing was made in furtherance of the mail fraud scheme.

843.    Zapata and Sluhoski knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

844. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $110,000.00 pursuant to the fraudulent bills submitted through the COR Lake Worth enterprise.

845. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTY-NINTH CAUSE OF ACTION
**Against COR Lake Worth, Zapata, and Sluhoski**
**(Under Fla. Stat. §§ 501.201 et seq.)**

846. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

847. COR Lake Worth, Zapata, and Sluhoski are actively engaged in trade and commerce in the State of Florida.

848. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

849. COR Lake Worth, Zapata, and Sluhoski engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

850. The bills and supporting documents submitted – or caused to be submitted – to GEICO by COR Lake Worth, Zapata, and Sluhoski were fraudulent in that they misrepresented: (i) COR Lake Worth's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

851. Such acts and practices offend public policy and are immoral, unethical, oppressive,

215

and unscrupulous. Additionally, the conduct of COR Lake Worth, Zapata, and Sluhoski has been materially injurious to GEICO and its Insureds.

852.    The conduct of COR Lake Worth, Zapata, and Sluhoski was the actual and proximate cause of the damages sustained by GEICO.

853.    COR Lake Worth, Zapata, and Sluhoski's unfair and deceptive acts have caused GEICO to sustain damages of at least $110,000.00.

854.    By reason of COR Lake Worth, Zapata, and Sluhoski's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SEVENTIETH CAUSE OF ACTION**
**Against COR Lake Worth, Zapata, and Sluhoski**
**(Common Law Fraud)**

855.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

856.    COR Lake Worth, Zapata, and Sluhoski intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through COR Lake Worth for the Fraudulent Services.

857.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that COR Lake Worth was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not

216

medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

858.    COR Lake Worth, Zapata, and Sluhoski intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through COR Lake Worth that were not reimbursable.

859.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $110,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by COR Lake Worth, Zapata, and Sluhoski through COR Lake Worth.

860.    COR Lake Worth, Zapata, and Sluhoski's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

861.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SEVENTY-FIRST OF ACTION
### Against COR Lake Worth, Zapata, and Sluhoski
### (Unjust Enrichment)

862.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

863.    As set forth above, COR Lake Worth, Zapata, and Sluhoski have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

864.    When GEICO paid the bills and charges submitted – or caused to be submitted –

by COR Lake Worth, Zapata, and Sluhoski through COR Lake Worth, it reasonably believed that it was legally obligated to make such payments based on COR Lake Worth, Zapata, and Sluhoski's improper, unlawful, and/or unjust acts.

865. COR Lake Worth, Zapata, and Sluhoski have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that COR Lake Worth, Zapata, and Sluhoski voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

866. COR Lake Worth, Zapata, and Sluhoski's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

867. By reason of the above, COR Lake Worth, Zapata, and Sluhoski have been unjustly enriched in an amount to be determined at trial, but in no event less than $110,000.00.

**SEVENTY-SECOND CAUSE OF ACTION**
**Against Applebaum**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

868. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

869. TeleEMC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

870. Applebaum knowingly conducted and/or participated in, directly or indirectly, the conduct of TeleEMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that TeleEMC was not eligible to receive under the No-Fault Law because: (i) TeleEMC was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the

underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

871.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15".

872.    TeleEMC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Applebaum operated TeleEMC, inasmuch as TeleEMC was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for TeleEMC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that TeleEMC and Applebaum continue to attempt collection on the fraudulent billing submitted through TeleEMC to the present day.

873.    TeleEMC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by TeleEMC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

874.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills submitted through the TeleEMC enterprise.

875.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**SEVENTY-THIRD CAUSE OF ACTION**
**Against Applebaum and Kurzner**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

876.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

877.    TeleEMC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

878.    Applebaum and Kurzner were employed by – or associated with – the TeleEMC enterprise.

879.    Applebaum and Kurzner knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of TeleEMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that TeleEMC was not eligible to receive under the No-Fault Law because: (i) TeleEMC was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather

than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

880.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15". Each such mailing was made in furtherance of the mail fraud scheme.

881.    Applebaum and Kurzner knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

882.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills submitted through the TeleEMC enterprise.

883.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**SEVENTY-FOURTH CAUSE OF ACTION**
**Against TeleEMC, Applebaum, and Kurzner**
**(Under Fla. Stat. §§ 501.201 et seq.)**

884.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

885.    TeleEMC, Applebaum, and Kurzner are actively engaged in trade and commerce in the State of Florida.

886.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

887.    TeleEMC, Applebaum, and Kurzner engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

888.    The bills and supporting documents submitted – or caused to be submitted – to GEICO by TeleEMC, Applebaum, and Kurzner were fraudulent in that they misrepresented: (i) TeleEMC's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

889.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of TeleEMC, Applebaum, and Kurzner has been materially injurious to GEICO and its Insureds.

890.    The conduct of TeleEMC, Applebaum, and Kurzner was the actual and proximate cause of the damages sustained by GEICO.

891.    TeleEMC, Applebaum, and Kurzner's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,180,000.00.

892.    By reason of TeleEMC, Applebaum, and Kurzner's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SEVENTY-FIFTH CAUSE OF ACTION**
**Against TeleEMC, Applebaum, and Kurzner**
**(Common Law Fraud)**

893.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

894.    TeleEMC, Applebaum, and Kurzner intentionally and knowingly made false and

fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through TeleEMC for the Fraudulent Services.

895.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that TeleEMC was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

896.   TeleEMC, Applebaum, and Kurzner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through TeleEMC that were not reimbursable.

897.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,180,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by TeleEMC, Applebaum, and Kurzner through TeleEMC.

898.   TeleEMC, Applebaum, and Kurzner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

899.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SEVENTY-SIXTH CAUSE OF ACTION
### Against TeleEMC, Applebaum, and Kurzner
### (Unjust Enrichment)

900.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-327, above.

901.     As set forth above, TeleEMC, Applebaum, and Kurzner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

902.     When GEICO paid the bills and charges submitted – or caused to be submitted – by TeleEMC, Applebaum, and Kurzner through TeleEMC, it reasonably believed that it was legally obligated to make such payments based on TeleEMC, Applebaum, and Kurzner's improper, unlawful, and/or unjust acts.

903.     TeleEMC, Applebaum, and Kurzner have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that TeleEMC, Applebaum, and Kurzner voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

904.     TeleEMC, Applebaum, and Kurzner's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

905.     By reason of the above, TeleEMC, Applebaum, and Kurzner have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,180,000.00.

### JURY DEMAND

906.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co.,

GEICO General Insurance Company, and GEICO Casualty Co. demand a Judgment be entered in their favor:

A.      On the First Cause of Action against the COR Clinics and TeleEMC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the COR Clinics and TeleEMC have no right to receive payment for any of the pending bills submitted to GEICO.

B.      On the Second Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,640,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C.      On the Third Cause of Action against Zapata, Mattos, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,640,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

D.      On the Fourth Cause of Action against COR Kendall, Zapata, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $3,640,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.      On the Fifth Cause of Action against COR Kendall, Zapata, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $3,640,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against COR Kendall, Zapata, Mattos, and Choxi, more than $3,640,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.      On the Seventh Cause of Action against Zapata, compensatory damages in favor of

GEICO in an amount to be determined at trial but in excess of $1,180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

H.      On the Eighth Cause of Action against Zapata, Hall, Mattos, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I.      On the Ninth Cause of Action against COR East Miami, Zapata, Hall, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $1,180,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

J.      On the Tenth Cause of Action against COR East Miami, Zapata, Hall, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $1,180,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

K.      On the Eleventh Cause of Action against COR East Miami, Zapata, Hall, Mattos, and Choxi, more than $1,180,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.      On the Twelfth Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,110,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

M.      On the Thirteenth Cause of Action against Zapata, El Kommos, Choxi, and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,110,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18

U.S.C. § 1964(c), plus interest.

N.      On the Fourteenth Cause of Action against COR Orlando, Zapata, El Kommos, Choxi, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $2,110,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

O.      On the Fifteenth Cause of Action against COR Orlando, Zapata, El Kommos, Choxi, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $2,110,000.00, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

P.      On the Sixteenth Cause of Action against COR Orlando, Zapata, El Kommos, Choxi, and Bowser, more than $2,110,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Q.      On the Seventeenth Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,850,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

R.      On the Eighteenth Cause of Action against Zapata, Mattos, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,850,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

S.      On the Nineteenth Cause of Action against COR North Miami, Zapata, Mattos, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,850,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat.

§ 501.211(2).

T.      On the Twentieth Cause of Action against COR North Miami, Zapata, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $2,850,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

U.      On the Twenty-First Cause of Action against COR North Miami, Zapata, Mattos, and Choxi, more than $2,850,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

V.      On the Twenty-Second Cause of Action against Zapata compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,990,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

W.      On the Twenty-Third Cause of Action against Zapata, Mattos, and Salado, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,990,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

X.      On the Twenty-Fourth Cause of Action against COR Hialeah, Zapata, Mattos, and Salado, compensatory damages in an amount to be determined at trial but in excess of $1,990,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Y.      On the Twenty-Fifth Cause of Action against COR Hialeah, Zapata, Mattos, and Salado, compensatory damages in an amount to be determined at trial but in excess of $1,990,000.00, together with punitive damages, costs, and interest, along with such other and

further relief as this Court deems just, proper, and equitable.

Z.      On the Twenty-Sixth Cause of Action against COR Hialeah, Zapata, Mattos, and Salado, more than $1,990,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

AA.    On the Twenty-Seventh Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $780,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

BB.    On the Twenty-Eighth Cause of Action against Zapata, Hall, Sluhoski, Rizzolo, and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $780,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

CC.    On the Twenty-Ninth Cause of Action against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $780,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

DD.    On the Thirtieth Cause of Action against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $780,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

EE.    On the Thirty-First Cause of Action against COR Jacksonville, Zapata, Hall, Sluhoski, Rizzolo, and Bowser, more than $780,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

FF.    On the Thirty-Second Cause of Action against Zapata, compensatory damages in

favor of GEICO in an amount to be determined at trial but in excess of $4,700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

GG.    On the Thirty-Third Cause of Action against Zapata, Mattos, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $4,700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

HH.    On the Thirty-Fourth Cause of Action against COR West Broward, Zapata, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $4,700,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

II.    On the Thirty-Fifth Cause of Action against COR West Broward, Zapata, Mattos, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $4,700,000.00, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

JJ.    On the Thirty-Sixth Cause of Action against COR West Broward, Zapata, Mattos, and Choxi, more than $4,700,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

KK.    On the Thirty-Seventh Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,210,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

LL.    On the Thirty-Eighth Cause of Action against Zapata, Hall, and Sluhoski,

compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,210,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

MM.   On the Thirty-Ninth Cause of Action against COR Hollywood, Zapata, Hall, and Sluhoski, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,210,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

NN.   On the Fortieth Cause of Action against COR Hollywood, Zapata, Hall, and Sluhoski, compensatory damages in an amount to be determined at trial but in excess of $2,210,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

OO.   On the Forty-First Cause of Action against COR Hollywood, Zapata, Hall, and Sluhoski, more than $2,210,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

PP.   On the Forty-Second Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

QQ.   On the Forty-Third Cause of Action against Zapata, Mattos, Grau, and Salado, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

RR.   On the Forty-Fourth Cause of Action against COR Homestead, Zapata, Mattos,

Grau, and Salado, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,160,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

SS.     On the Forty-Fifth Cause of Action against COR Homestead, Zapata, Mattos, Grau, and Salado, compensatory damages in an amount to be determined at trial but in excess of $2,160,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

TT.     On the Forty-Sixth Cause of Action against COR Homestead, Zapata, Mattos, Grau, and Salado more than $2,160,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

UU.     On the Forty-Seventh Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,890,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

VV.     On the Forty-Eighth Cause of Action against Zapata, El Kommos, Choxi, and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,890,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

WW.     On the Forty-Ninth Cause of Action against COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,890,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

XX.     On the Fiftieth Cause of Action against COR Kissimmee, Zapata, El Kommos,

Choxi, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $1,890,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

YY.    On the Fifty-First Cause of Action against COR Kissimmee, Zapata, El Kommos, Choxi, and Bowser, more than $1,890,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

ZZ.    On the Fifty-Second Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $680,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

AAA.   On the Fifty-Third Cause of Action against Zapata and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $680,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

BBB.   On the Fifty-Fourth Cause of Action against COR Pompano, Zapata, and Choxi, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $680,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

CCC.   On the Fifty-Fifth Cause of Action against COR Pompano, Zapata, and Choxi, compensatory damages in an amount to be determined at trial but in excess of $680,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

DDD.   On the Fifty-Sixth Cause of Action against COR Pompano, Zapata, and Choxi, more than $680,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

EEE.   On the Fifty-Seventh Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $940,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

FFF.   On the Fifty-Eighth Cause of Action against Zapata and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $940,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

GGG.   On the Fifty-Ninth Cause of Action against COR Tampa, Zapata, and Bowser, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $940,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

HHH.   On the Sixtieth Cause of Action against COR Tampa, Zapata, and Bowser, compensatory damages in an amount to be determined at trial but in excess of $940,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

III.   On the Sixty-First Cause of Action against COR Tampa, Zapata, and Bowser, more than $940,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

JJJ.   On the Sixty-Second Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

KKK.   On the Sixty-Third Cause of Action against Zapata, Choxi, and Sluhoski, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18

U.S.C. § 1964(c), plus interest.

LLL.   On the Sixty-Fourth Cause of Action against COR West Palm, Zapata, Choxi, and Sluhoski, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

MMM. On the Sixty-Fifth Cause of Action against COR West Palm, Zapata, Choxi, and Sluhoski, compensatory damages in an amount to be determined at trial but in excess of $240,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

NNN.   On the Sixty-Sixth Cause of Action against COR West Palm, Zapata, Choxi, and Sluhoski, more than $240,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

OOO.   On the Sixty-Seventh Cause of Action against Zapata, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $110,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

PPP.   On the Sixty-Eighth Cause of Action against Zapata and Sluhoski, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $110,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

QQQ.   On the Sixty-Ninth Cause of Action against COR Lake Worth, Zapata, and Sluhoski, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $110,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

RRR.   On the Seventieth Cause of Action against COR Lake Worth, Zapata, and Sluhoski, compensatory damages in an amount to be determined at trial but in excess of $110,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

SSS.   On the Seventy-First Cause of Action against COR Lake Worth, Zapata, and Sluhoski, more than $110,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

TTT.   On the Seventy-Second Cause of Action against Applebaum, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

UUU. On the Seventy-Third Cause of Action against Applebaum and Kurzner, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,180,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

VVV. On the Seventy-Fourth Cause of Action against TeleEMC, Applebaum, and Kurzner, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,180,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

WWW.        On the Seventy-Fifth Cause of Action against TeleEMC, Applebaum, and Kurzner, compensatory damages in an amount to be determined at trial but in excess of $1,180,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

XXX.   On the Seventy-Sixth Cause of Action against TeleEMC, Applebaum, and Kurzner,

more than $1,180,000.00 in compensatory damages, plus costs and interest, along with such other

and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
      January 22, 2026

                            /s/ Max Gershenoff
                            Max Gershenoff (FBN 1038855)
                            John P. Marino (FBN 814539)
                            Lindsey R. Trowell (FBN 678783)
                            Kristen Wenger (FBN 92136)
                            **RIVKIN RADLER LLP**
                            Riverplace Tower
                            1301 Riverplace Blvd.
                            Suite 1000
                            Jacksonville, Florida 32207
                            Phone: (904) 791-8948
                            Facsimile: (904) 598-6225
                            -and-
                            926 RXR Plaza
                            Uniondale, New York 11550
                            Phone: (516) 357-3000
                            Facsimile: (516) 357-3333
                            Max.Gershenoff@rivkin.com
                            John.Marino@rivkin.com
                            Lindsey.Trowell@rivkin.com
                            Kristen.Wenger@rivkin.com
                            *Counsel for Plaintiffs*